IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Court of Appeals No: 16-2644

Allen, et al,

Appellants

v.

De Bello, et al,

Defendants.

On Appeal from the United State District Court
for the District of New Jersey

**Appellants' Brief and Appendix** (volume I)

PAUL A CLARK, ESQ
10 Huron Ave, Suite 1N
Jersey City, NJ 07306
(202) 368-5435
NJ Bar #  04261-2011

Attorney for Appellants

# Table of Contents

Table of Contents ……………………………………………………………………..i

Table of Authorities ……………………………………………………………iii

Jurisdictional Statement ...........................................................................................1

Statement of the Issues Presented For Review .........................................................1

Concise Statement Of The Case ...............................................................................1

Summary Of The Argument ......................................................................................5

ARGUMENT .............................................................................................................6

1. Standard of Review............................................................................................6

2. This case presents a "Case or Controversy" under Article III...........................7

3. Relief under § 1983 was appropriate as she Supreme Court in *Pulliam* held that suits naming state court judges as defendants were permitted under § 1983 in circumstances identical to the instant case, and although Congress amended § 1983 to limit injunctive relief that limitation does not change the applicability to the instant case. ....................................................................................................12

    i. The First Circuit's Decision *In Re Justices*, supports jurisdiction in this case, although it also conflicts with Supreme Court precedent...............................16

    ii. Third Circuit Precedent supports jurisdiction and a claim under 1983.......18

4. The Court erred in ruling that the demand for injunctive relief should be dismissed because there was an adequate remedy at law, however there was no adequate remedy at law particularly for purposes of section 1983 ....................25

5. The Court erred in dismissing the Complaint with prejudice for failure to name an appropriate enforcement official without specifying who that official might be and without permitting amendment of the complaint to name an "appropriate official." ........................................................................................26

6. The District Court erred in failing to enter declaratory judgment because Declaratory Judgment under 28 U.S.C. § 2201 is coextensive with Article III jurisdiction which exists here. ............................................................................28

CONCLUSION ........................................................................................................30

Certificate of Service ……………………………………………………………..31

Certificate of Compliance……….…………………………………………………..31

Certificate of Text  ...……………………………………………………………..31

Certificate of Virus Check ………………………………………………………..32

Certificate of Admission to Bar  ...……………………………………………..32

Appendix Volume I follows

Appendix Volume II bound separately

## Table of Authorities

Anthony v. Council, 316 F.3d 412 (3d Cir. 2003)....................................................11

B.S. v. Somerset County, 704 F.3d 250 (2013) ....................................................2, 5

Barefoot Architect, Inc. v. Bunge, 632 F.3d 822 (3d Cir. 2011)..............................6

Brandon E. ex rel. Listenbee v. Reynolds, 201 F.3d 194 (3d Cir. 2000) ........ *passim*

Const. Party of Pennsylvania v. Aichele, 757 F.3d 347 (3d Cir. 2014) .............. 28-9

Employers Ins. of Wausau v. Crown Cork & Seal Co., Inc., 905 F.2d 42 (3d Cir. 1990) ....................................................................................................................7

Fernandez v. Trias Monge, 586 F.2d 848, 850 (1st Cir. 1978) ...............................15

Heimbach v. Village of Lyons (Wayne County, N. Y.), 597 F.2d 344 (2d Cir. 1979) ...................................................................................................................16

In re Justices, 695 F.2d at 23 (1st Cir 1982) ................................................... *passim*

In re New Jersey Title Ins. Litig., 683 F.3d 451 (3d Cir. 2012) ..............................26

Juidice v. Vail, 430 U.S. 327 (1977) ................................................................. 10-11

Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827 (1990)....................27

Khodara Envtl., Inc. v. Blakey, 376 F.3d 187, 193–94 (3d Cir. 2004) ....................7

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007) ....................28

Nichols v. Sivilli, CIV. 2:14-3821 WJM, 2014 WL 7332020 (D.N.J. Dec. 19, 2014) (unpub)................................................................................................ 11-12

Pulliam v. Allan, 466 U.S. 522 (1984) ........................................................... *passim*

R.W.T. v. Dalton, 712 F.2d 1225, 1233 (8th Cir. 1983) .........................................27

Rivera-Puig v. Garcia-Rosario, 983 F.2d 311 (1st Cir. 1992)................................18

Steffel v. Thompson, 415 U.S. 452 (1974)...........................................................7, 29

U.S. v. Com. of Pa., Dept. of Envtl. Resources, 923 F.2d 1071 (3d Cir. 1991)..7, 28

Wooley v. Maynard, 430 U.S. 705 (1977)...............................................................25

WXYZ, Inc. v. Hand, 658 F.2d 420, 421 (6th Cir. 1981) .......................................15

Constitutional Provisions

Article III, sect 2 ("case or controversy") …………………..……………*passim*

Federal Statutes

42 USC § 1983 …………………………………………..…………………*passim*

28 USC § 2201 …………………………………………..…………………*passim*

State Statutes anf Court Rules

N.J. Stat § 9:2-4 …………………………..…………………………………..23-4

N.J. Rule 2:2-4…………………………………………………………..26

N.J. Rule 5:8-6………………………………………………………..26

# JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 ("DJA").

This Court has jurisdiction under 28 U.S.C. § 1291, and 28 U.S.C. §§ 2201-02. The appeal was timely filed in May 25, 2016 from an Order entered on April 27, 2016 that disposed of all parties' claims. A1-2; A41-3.

# STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the suit by plaintiffs against judicial defendants to halt violation of due process and substantive rights under color of law present an Article III case or controversy? A24-27; A70n.6.
2. Were Plaintiffs entitled to declaratory or injunctive relief under 42 USC § 1983? A42-3
3. Were Plaintiffs entitled to declaratory relief under 28 U.S.C. § 2201? A68.

# CONCISE STATEMENT OF THE CASE

Plaintiffs are thirteen fathers and their children who were separated by order of defendant family court judges without a plenary hearing, that is, without an opportunity to present evidence or cross examine their accusers. A99-132 (Complaint ECF #30). Plaintiffs primarily seek declaratory relief that the procedures used by judicial defendants to strip parents of custody without due process is unconstitutional—however, plaintiffs also seek injunctive relief if available. A100, ¶ 2.

New Jersey family court judges, including the Defendants in this case, routinely strip parents of physical and legal custody of their children—often

prohibiting any contact whatsoever for months or years—without a plenary hearing or any findings of fact.  A104-17, ¶¶ 55-56, 62.70-72, 85-86, 107-8, 122, 137-8, 160-1, 170-1, 178-85.  More specifically, New Jersey and individual defendants have an established policy that when custody of one parent is terminated in favor of another parent that the parent facing lost of custody has no substantive rights at issue. A126, ¶¶ 272-274.  This policy of denying substantive rights to parents who lose custody to another parent is the same policy which the Third Circuit unambiguously held in *B.S. v. Somerset County*, 704 F.3d 250 (2013) to be unconstitutional.  State statutes, court rules and precedent do require important procedural protections when terminating custody, including a plenary hearing. A125, ¶¶ 266-269.  However, each of the judicial defendants violated those procedural requirements in this case. A104-17, ¶¶ 55-56, 62.70-72, 85-86, 107-8, 122, 137-8, 160-1, 170-1, 178-85.  Unfortunately the failure to follow the required procedures is common in New Jersey courts, with the Appellate Division describing this as "business as usual."  A125, ¶ 269 (quoting New Jersey Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 265-8 (App. Div. 2002).

This Court is referred to the Complaint for a full set of facts, but just as examples we summarize what happened to a few the Plaintiffs.  Judge Sogluizzo cut off all contact (even phone contact) between Feldman and his children from October 24, 2013 to March 10, 2014, without a plenary hearing and based on allegations later found to be "not established."  A106, ¶¶ 70-75.   Judge De Bello

stripped Graf of legal custody and almost all contact with his daughters for four months without a plenary hearing based on allegations later deemed false. A107 ¶¶ 81-7.

Hill was only permitted to see A.H. during "reunification therapy" although even this contact was suspended by Judge Sherri L. Schweitzer In April 2014 after Hill's wife filed for a TRO.  A112, ¶¶ 130-34.  The TRO was dismissed from municipal court but as of the filing of the amended complaint in August 2015, "Hill ha[d] not seen his son, A.H. since April 2014"—over a year.  A113. ¶¶ 135. 138. No plenary hearing was ever conducted. A113, ¶ 135.

Malhan was notified of an order to show cause being filed in New Jersey Court less than two hours before the proceeding.  A116, ¶ 179. Malhan was not allowed to present evidence or cross examine his wife (who did not testify but presented allegations by way of an affidavit). A116 ¶ 178-82.   Judge Sogluizzo stripped Malhan of custody of his two children and awarded full legal and physical custody to his wife. A117, ¶ 183. The court made no findings of fact, and no plenary hearing was ever held. A117,  ¶¶ 185, 189-92.

In February 2014 Judge Severiano Lisboa signed an Order that limited Olivier's parenting time with his daughter to one supervised visitation per week.. A119, ¶ 206.   No plenary hearing was held. A119, at ¶ 207.   On 8/7/14 Judge Lisboa suspended all visitation until further order of the court and until Oliver complied with DCP&P recommendations. A120 ¶ 219. However, DCP&P had

closed the case they told Oliver they could NOT provide any services to Olivier and his child. A120, ¶ 220.  Between June 2014 and February 2015 Olivier did not see his daughter one single time. A120, ¶ 222.

Plaintiffs in the instant case have all had their parental rights severely constricted, or lost entirely for some period of time.  In every case this was done without a plenary hearing, sometimes in *ex parte* proceedings, usually without any findings of fact, and usually without any standard whatsoever being articulated, based on unsubstantiated allegations. A123, ¶ 246.   Plaintiffs do not seek to have any statute declared unconstitutional.  See CIS A79; see also generally Complaint A99-132.

Plaintiffs initiated suit on February 5, 2014 by filing a complaint and related documents.  A79.  The initial Complaint named the State of New Jersey, the Clerk of the Superior Court, the Superior Court and presiding judges from several counties as defendants.  A79-80.   On June 14, 2016 defendants filed a motion to dismiss raising a variety of legal issues.  ECF # 15.  On January 16, 2015 the court granted in part Defendants' Motion to Dismiss.  A3-4.  The Court ruled that all of the plaintiffs other than Edelglass had standing so that there was an Article III case or controversy.  A24-27.  The Court dismissed the State of New Jersey on Eleventh Amendment grounds but ruled that prospective relief against individual defendants was not so barred.  A28.  The court also dismissed several of the individual plaintiffs' claims on statute of limitations grounds.  A32-38.  Finally,

the Court dismissed claims against presiding judges in their capacity as presiding judges, without prejudice with leave to amend to name individual judges responsible for entering the specific orders art issue.  A3-4.

On January 22, 2015, Plaintiffs filed a motion to amend to name individual judicial officers who entered specific orders as well as adding several more plaintiffs who had also suffered lost of familial rights without due process.

On August 5, 2015 the Court granted Plaintiff's motion to amend.  ECF 28. On August 7, 2016 the final amended complaint was filed.  A99.  On September 21, 2015, Defendants filed a motion to dismiss.  ECF #35.  The Court granted the motion to dismiss in part on April 27, 2016. A41-2.  A Notice of Appeal was timely filed on May 25, 2016 challenging the basis for dismissal. A1.

## SUMMARY OF THE ARGUMENT

The State of New Jersey and judicial defendants deprived plaintiffs of custody (and correspondingly deprived plaintiff children of contact with their parents) without due process and without any consideration of the fundamental rights at issue. *B.S. v. Somerset Cnty.*, 704 F.3d 250, 272 (3d Cir. 2013). ("From the parent's perspective, there may be little meaningful difference between instances in which the state removes a child and takes her into state custody and those in which the state shifts custody from one parent to another, as occurred here. In either case, the government has implicated a fundamental liberty interest of the parent who loses custody.")

The District Court dismissed Plaintiffs' Complaint under 42 USC § 1983 on the basis that judicial defendants' were not "proper plaintiffs" although the court appeared to rule that there was an Article III case or controversy. A70. The primary relief sought was under the Declaratory Judgment Act which is co-extensive with Article III. The Court did not explain the dismissal with respect to the DJA, but because the DJA is co-extensive with Article III this was error.

The dismissal of the Complaint under 42 USC § 1983 was also error as Supreme Court precedent clearly holds that in challenges to due process in federal court, that judges are the appropriate defendants. The district court erred in ruling that Plaintiffs were required to seek appellate review on the state level, as precedents clearly hold that such action is not required for relief under § 1983.

## ARGUMENT

### I.    Standard of Review

The Court of Appeals review a grant of motion to dismiss de novo applying the same standard as the lower court, namely accepting all allegations as true and drawing all reasonable inferences in favor of plaintiff. Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 826 (3d Cir. 2011). The district court erred as a matter of law ruling that there was no cause of action against Defendants.

The standard of review for denial of declaratory judgment is unique:

> We review a dismissal under the Declaratory Judgment Act for abuse of discretion. *Terra Nova Ins. Co., Ltd. v. 900 Bar, Inc.,* 887 F.2d 1213, 1224 (3d Cir.1989). This standard is applied

6

with a caveat, however; because the Declaratory Judgment Act should "have a liberal interpretation," "the ambit of the district court's discretion is somewhat circumscribed and the range of our review is correspondingly enlarged" when the district court has denied declaratory relief. *Exxon Corp. v. Federal Trade Commission,* 588 F.2d 895, 900 (3d Cir.1978).

U.S. v. Com. of Pa., Dep't of Envtl. Res., 923 F.2d 1071, 1073 (3d Cir. 1991).

The District Court erred as a matter of law in dismissing under the DJA.

## 2. This case presents a "Case or Controversy" under Article III

A threshold question to be addressed before anything else is the existence

of jurisdiction under Article III of the Constitution:

At the threshold we must consider whether petitioner presents an 'actual controversy,' a requirement imposed by Art. III of the Constitution and the express terms of the Federal Declaratory Judgment act, 28 U.S.C. s 2201.

Steffel v. Thompson, 415 U.S. 452, 458 (1974).

As the Third Circuit has further explained:

It is an elementary principle that federal courts are courts of limited jurisdiction, empowered to hear cases only as provided for under Article III of the Constitution and congressional enactments pursuant thereto. *Bender v. Williamsport Area School District,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). … Moreover, "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.' " *Bender,* 475 U.S. at 541, 106 S.Ct. at 1331

Employers Ins. of Wausau v. Crown Cork & Seal Co., Inc., 905 F.2d 42, 45 (3d

Cir. 1990) (additional citations omitted).

The Third Circuit explained in *Khodara Envtl., Inc. v. Blakey*, 376 F.3d

7

187, 193–94 (3d Cir. 2004):

> "Article III of the Constitution limits the federal judicial power
> to 'Cases' or 'Controversies,' thereby entailing as an
> 'irreducible minimum' that there be (1) an injury in fact, (2) a
> causal relationship between the injury and the challenged
> conduct, and (3) a likelihood that the injury will be redressed by
> a favorable decision." United Food and Commercial Workers
> Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551, 116
> S.Ct. 1529, 134 L.Ed.2d 758 (1996)..

Plaintiffs here meet this test as they have suffered injury in the form of deprivation of fundamental rights, the injury is a result of the denial of due process by defendants, and a favorable decision should put an end to such treatment. Indeed, at an earlier stage of the proceedings the district court in this case ruled that there was Article III jurisdiction:

> To satisfy the "case or controversy" standing requirement under
> Article III, a plaintiff must establish that he or she has suffered a
> cognizable injury that is causally related to the alleged conduct of
> the defendant and is redressable by judicial action.
> … Plaintiffs have alleged that the state courts have a policy of
> denying parents a plenary hearing when one parent loses custody
> to the other parent. Am. Compl. at ¶ 102. Plaintiffs further allege
> that this policy is authorized by the New Jersey Supreme Court and
> Appellate Division. Id. at ¶¶ 100–101. Therefore, Plaintiffs have
> alleged that they are likely to suffer such an injury again.

A24. The court's later decision did not state that this part of the earlier decision was being reconsidered. See gen., A41-78.

The Supreme Court and federal courts of appeal have routinely found there to a be a "case or controversy" in cases naming judges as defendants in suits

challenging denial of due process and substantive rights in state court.[1] The case most directly on point is the Supreme Court's decision in *Pulliam v. Allan,* 466 U.S. 522 (1984).  *Pulliam* involved a procedurally identical situation in which Judge Pulliam was named as defendant to halt violations of due process by the Virginia courts, and the Court explicitly referenced that the Article III case or controversy requirement as articulated by *In Re Justices* could be a limit on some suits against judges but not Allan's suit.

  *Pulliam v. Allan* involved a challenge to the practice of Virginia court denying bail for minor offenses which named Judge Pulliam as defendant:

> Petitioner Gladys Pulliam is a state Magistrate in Culpeper County, Va. Respondents Richmond R. Allen and Jesse W. Nicholson were plaintiffs in a § 1983 action against Pulliam brought in the United States District Court for the Eastern District of Virginia. They claimed that Magistrate Pulliam's practice of imposing bail on persons arrested for nonjailable offenses under Virginia law and of incarcerating those persons if they could not meet the bail was unconstitutional.

*Id.* at 524-25 (emphasis added).

  In comparison, in the instant case, Plaintiffs allege that judicial defendants' practice of terminating parental rights without a plenary hearing and related due process is unconstitutional.  Thus, both cases challenge the constitutionality of a judicial practice through a suit naming the judge as defendant.

  The Supreme Court in footnote two explained more about the suit:

---

[1]  Many of these cases are discussed infra regarding the scope of § 1983.

> Respondents had challenged <u>both the constitutionality of the Virginia pretrial detention statute and petitioner's practice of imposing bail for nonincarcerable offenses.</u> Virginia Code § 19.2–74.1 (later repealed by 1981 Va.Acts, ch. 382) prohibited the retention in custody of any person arrested for a misdemeanor for which he could not receive a jail sentence.

*Id.* at 526 n.2 (emphasis added).

In *Pulliam* the Court permitted suit against Judge Pulliam to challenge "both the constitutionality of the Virginia pretrial detention statute and [Judge Pulliam's] practice." The Supreme Court in *Pulliam* then explicitly noted that in some cases, unlike the case in *Pulliam*, Article III might impose limitations:

> Fn 18. Article III also imposes limitations on the availability of injunctive relief against a judge. See <u>In re Justices of Supreme Court of Puerto Rico, 695 F.2d 17, 21 (CA1 1982)</u> (no case or controversy between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute). See also <u>Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)</u> (claims for injunctive relief against unconstitutional state practice too speculative).

*Id.* at 538.

Thus, the Court was quite clear, that while Article III might impose limitations in some case it did not apply in a case where a Plaintiff sought to challenge the denial of due process by state judges names as defendants.

Similarly, in <u>Juidice v. Vail</u>, 430 U.S. 327 (1977) the Supreme Court allowed suit against a judge regarding a denial of due process. In that case, appellant Juidice, was "a Justice of the Dutchess County Court" *Id* at 329. Vail

filed suit in federal court arguing that the procedures denied him due process. The proceedings were implemented by a private party "Public Loan Co." seeking to enforce a default judgment against Vail. *Id.* The Supreme Court began by noting:

> Although raised by neither of the parties, we are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III, to seek injunctive relief in the District Court.

*Id* at 331.

The Court concluded that there was standing, but ultimately dismissed on abstention grounds. *Id.* at 333. Again there was no suggestion that Judge Juidice was not a proper party or that there was any Article III problem with him being defendant.[2] *See also*, *Anthony v. Council*, 316 F.3d 412, 415 (3d Cir. 2003) (abstaining from deciding a case in which state judges were defendants but holding that there was standing under Article III).

Moreover, as discussed in the next section, continuing with the analysis of *Pulliam*, federal courts have routinely assumed jurisdiction in § 1983 suits naming judges as defendants when challenging lack of due process or even judicial statutes.

Finally as Judge Martini recently explained in rejecting a similar claim that there was no case or controversy in a challenge to a court order:

---

[2]  The district court held it was a violation of due process for debter "to be held in contempt, fined and imprisoned without a hearing" Vail v. Quinlan, 406 F. Supp. 951, 953-56 (S.D.N.Y. 1976), rev'd sub nom. Juidice v. Vail, 430 U.S. 327 (1977).

The Court finds that the present case is distinguishable from In re Justices and concludes that a case or controversy exists between Nichols and Judge Sivilli. First, the In re Justices Court partially rested its conclusion on the fact that the Justices in that case were not responsible for enforcing the statute that was being challenged. In contrast, New Jersey law empowers Judge Sivilli to enforce the Gag Order should the parties fail to comply with its terms. … Because Judge Sivilli is responsible for enforcing her Order, it cannot be said that her relationship to the Order is merely adjudicative. See In re Justices, 695 F.2d at 22.

It is also significant that Judge Sivilli drafted the terms of the Gag Order. As In re Justices and its progeny point out, judges will seldom have a personal stake in a constitutional challenge to a statute because they rarely have any role in the enactment of the statute. The Gag Order in this case, however, is a product of Judge Sivilli's creation. Judge Sivilli drafted the terms of the Gag Order and entered the Order so as to give it legal effect.

Nichols v. Sivilli, CIV. 2:14-3821 WJM, 2014 WL 7332020, at *3-4 (D.N.J. Dec. 19, 2014).[3]

**3.  Relief under § 1983 was appropriate as she Supreme Court in *Pulliam* held that suits naming state court judges as defendants were permitted under § 1983 in circumstances identical to the instant case, and although Congress amended § 1983 to limit injunctive relief that limitation does not change the applicabilty to the instant case.**

After the decision in *Puliam* Congress amended § 1983 to limit injunctive relief against judges to times when declaratory relief was unavailable (or inadequate) or also to enforce a declaratory judgment.  42 USC § 1983. The Third Circuit has noted that the amendment to § 1983 did not affect the availability of declaratory relief.  Brandon E. ex rel. Listenbee v. Reynolds, 201 F.3d 194, 197–

---

[3] Judge Martini treats this issue as a "case or controversy" issue, while Judge Wolfson treated it as a matter of interpretation of § 1983.

98 (3d Cir. 2000).

It should be noted that *Brandon* did not address the Declaratory Judgment Act.  Unlike the instant suit. which was brought under both § 1983 and the DJA, plaintiffs in *Brandon* appear to have only pled § 1983.  Accordingly, the Third Circuit appears to have held that § 1983 allows for declaratory judgment separate from the DJA whenever judges may be named as defendants to a § 1983 action.

But *Pulliam* clearly held that judges were proper defendants under 1983.[4]

The Court then added in footnote 22 to the above:

> Virginia provides, for instance, for appellate review of orders denying bail or requiring excessive bail, see Va. Code § 19.2–124 (1983), and for state habeas corpus relief from unlawful detention, see Va. Code § 8.01–654 (Supp. 1983). On the other hand, the nature and short duration of the pretrial detention imposed by petitioner was such that it may have been impossible for respondents to avail themselves of these remedies. Cf. Gerstein v. Pugh, 420 U.S. 103, 110, n. 11, 95 S.Ct. 854, 861, n. 11, 43 L.Ed.2d 54 (1975).

*Id.* at 543.

The above makes clear that the high court was aware of potential procedural problems, but the Court had no apparent jurisdictional concern with naming as defendant the judge who whose policies were unconstitutional.  Indeed, the emphasized the importance of individual judges being subject to 1983 actions:

> As illustrated above, there is little support in the common law for a rule of judicial immunity that prevents injunctive relief

---

[4]  Moreover, if declaratory relief is unavailable, as the district court ruled, then the amendment is simply not applicable to the instant case at all, and Pulliam is in full effect.

13

against a judge. There is even less support for a conclusion that Congress intended to limit the injunctive relief available under § 1983 in a way that would prevent federal injunctive relief against a state judge. ...

Congress enacted § 1983 and its predecessor, § 2 of the Civil Rights Act of 1866, 14 Stat. 27, to provide an independent avenue for protection of federal constitutional rights. The remedy was considered necessary because "state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights." Mitchum v. Foster, 407 U.S. 225, 240, 92 S.Ct. 2151, 2161, 32 L.Ed.2d 705 (1972). See also Pierson v. Ray, 386 U.S., at 558–564, 87 S.Ct., at 1219–1222 (dissenting opinion) (every Member of Congress who spoke to the issue assumed that judges would be liable under § 1983).

Subsequent interpretations of the Civil Rights Acts by this Court acknowledge Congress' intent to reach unconstitutional actions by all state actors, including judges. ... Since a State acts only by its legislative, executive, or judicial authorities, the constitutional provision must be addressed to those authorities, including the State's judges. Section 4 was an exercise of Congress' authority to enforce the provisions of the Fourteenth Amendment and, like the Amendment, reached unconstitutional state judicial action.[21]

*Id.* at 540-41.

The Supreme Court also cited with approval a number of circuit court cases which had proceeded with judges as defendants:

At least seven Circuits have indicated affirmatively that there is no immunity bar to such relief, and in situations where in their judgment an injunction against a judicial officer was necessary to prevent irreparable injury to a petitioner's constitutional rights, courts have granted that relief.

*Id.* at 537 (*Fernandez* and *Hand* are discussed more *infra*).

14

The above makes it abundantly clear that suits against a state court judge is entirely appropriate when there is unconstitutional state judicial action even if there is an underlying statute that could be at issue. Just as in *Pulliam* the named defendants here have unconstitutional policies denying the fundamental rights of parents and children in state courts. In *Pulliam*, the ultimate target was the statute, and incidentally the policy of the defendant judge, which policy made him adverse enough to be a proper defendant.

The cases cited by the Court in *Pulliam* make clear this type of suit naming individual judges was common. In *WXYZ, Inc. v. Hand*, 658 F.2d 420, 421 (6th Cir. 1981) ((cited by the Court in *Pulliam* n.6):

> The court held that a Michigan statute and a suppression order issued by Judge Hand pursuant to that statute violated the First, Fifth, and Fourteenth Amendments to the United States Constitution. WXYZ, Inc. v. Hand, 463 F.Supp. 1070 (E.D.Mich.1979). We affirm.

Despite the fact that there was a statute behind the court order, the Sixth Circuit held affirmed that Judge Hand was an appropriate defendant.

Similarly, In Fernandez v. Trias Monge, 586 F.2d 848, 850 (1st Cir. 1978) the First Circuit permitted Plaintiff to name "defendant Carlos Haddock Perez, Judge of the Caguas Juvenile Court" as a party to challenge the constitutionality of a Puerto Rico law denying bail to minors. *Id.* at 850. The First Circuit further explained:

> No appeal was taken to the United States Supreme Court.

15

> Instead, on December 13, plaintiff filed a class action in federal district court pursuant to 42 U.S.C. sec. 1983 (1970), seeking a stay of state criminal proceedings scheduled to begin December 15, a declaration that the juvenile court procedure violated the federal constitution and an injunction enjoining defendants, Judge Perez, and the Honorable Jose Trias Monge, Chief Justice of the Supreme Court of Puerto Rico, in his administrative capacity, from following the procedure of detaining juveniles without a probable cause hearing.

*Id.* at 850.

Similarly in Heimbach v. Village of Lyons (Wayne County, N. Y.), 597 F.2d 344, 347 (2d Cir. 1979) (cited by the Court in *Pulliam* n.6) the Second circuit held that a state court judge was a proper defendant for injunctive relief:

Aside from the case or controversy issue all of the above cases held that state court judges were properly named as defendants under § 1983.

### i. The First Circuit's Decision *In Re Justices*, supports jurisdiction in this case, although it also conflicts with Supreme Court precedent

*In re Justices* ruled that the justices were proper parties for injunctive or declaratory relief challenging some of the statutes. The court held that the justices were proper parties for purposes of some of the claims, but not others, and moreover explained that like many public officials who are sued in their official capacity, the named defendant is a "nominal party." *Id*. at 27.

Third Circuit offered a discussion of why it might be that there was no proper case or controversy for purposes of Article III over some of the other claims. However, the Court itself ultimately declined to rely on this argument

16

instead ruling that some of the causes of action failed to state a claim against the justices under § 1983:

> [W]e need not reach the Article III question directly here, for in light of these cases, and in light of the fact that the plaintiffs have made no representations in their complaint or in argument before us concerning a genuine risk of enforcement by the Justices, *cf. Dewey v. University of New Hampshire,* 694 F.2d 1 (1st Cir.1982), the plaintiffs' complaint does not state a claim against the Justices in their enforcement capacity.

*Id.* at 25 (additional citations omitted).

Needless to say, the basis on which *In re Justices* was decided is easily distinguishable from the instant case. In that case there was no "genuine risk of enforcement by the Justices," whereas in the instant case the District court ruled:

> Plaintiffs have alleged that the state courts have a policy of denying parents a plenary hearing when one parent loses custody to the other parent. Am. Compl. at ¶ 102. Plaintiffs further allege that this policy is authorized by the New Jersey Supreme Court and Appellate Division. *Id.* at ¶¶ 100–101. Therefore, Plaintiffs have alleged that they are likely to suffer such an injury again.

A26.

The First Circuit's interpretation of § 1983, appears to be contrary to the decision in *Pulliam*, discussed *supra*. It also appears to run afoul of the requirement that jurisdictional questions must be resolved first. Nevertheless, the First Circuit discussion sets forth a rule that when judges "act[] purely in their adjudicative capacity" and have no role whatsoever "as administrators, enforcers, or advocates" of a statute that § 1983 does not provide relief. (Emphasis added).

Unlike the paradigmatic case where a judge rules and the case is over, there is a different situation where there is as here, ongoing controversy over his disposition of an existing suit.

*In Re Justices* further added that an exception is present when necessary to ensure full relief to parties:

> In still other suits, it is arguably necessary to enjoin a judge to ensure full relief to the parties. *Cf.* <u>WXYZ, Inc. v. Hand,</u> 658 F.2d 420 (6th Cir.1981)</u> (plaintiff obtains injunction against state court enforcement of prior court suppression order). Such cases are unusual, for a court should not enjoin judges from applying statutes when complete relief can be afforded by enjoining all other parties with the authority to seek relief under the statute.

695 F.2d at 23.

Although not fleshed out, the First Circuit seems to have acknowledged that suits against judicial defendants are appropriate when they are necessary to ensure full relief to the parties.  That consideration applies in this case.

The First Circuit interpreted *In re Justices* in <u>Rivera-Puig v. Garcia-Rosario</u>, 983 F.2d 311 (1st Cir. 1992) where the First Circuit permitted suit against a judicial defendant to challenge court rules. *Id.* at 317-18.

### ii.  Third Circuit Precedent supports jurisdiction and a claim under 1983.

*Georgevich* explicitly permitted suits against judges as defendants:

> Plaintiff, Anthony Georgevich, instituted this class action under <u>42 U.S.C. § 1983 (1982)</u>, claiming that inmates serving less than two year sentences in state facilities are denied equal protection because they are not given the same due process protections as

inmates in county facilities or those who are under the Board's
authority.  The named defendant was Judge Samuel Strauss,
Georgevich's sentencing judge, and suit was filed against a class
of similarly positioned Pennsylvania judges

Georgevich, 772 F.2d at 1083.

Pennsylvania had a statute which "authorizes sentencing judges to parole all

prisoners serving less than two years, but sets up no procedures."  *Id.*  It was this

continuing supervisory function that set the case apart from a typical situation

where a judge passes sentence and move on.

The Third Circuit then dismissed three different theories urged for

dismissal, including: (2) state judges are not proper parties; and (3) dismissal is

appropriate under the *Pullman* abstention doctrine."  *Id.* at 1085.  The Court

explained judicial defendants' position as follows:

> Defendants suggest that the district court's dismissal is
> independently justified on the ground that the judicial class is not
> a proper party. … They proffer instead as the proper party
> defendant the Attorney General of Pennsylvania, who they claim
> has the duty to uphold the constitutionality of a challenged
> statute.[9]
>> Fn. 9. For his part, the Attorney General has proven to
>> be a reluctant partner. … As intervenor, however, he has
>> maintained his position that he is not the proper party
>> defendant.

*Id.* at 1087.

The Third Circuit ruled that there was a case or controversy where judges

were defendants even when there was some other defendant who could be named.

The reason the judges were proper defendants was explained as follows:

> The judges' challenge to their status as party defendants appears to misconceive the basis on which the present suit rests. This is not a case in which judges are sued in their judicial capacity as neutral adjudicators of disputes. See, e.g., In re Justices of the Supreme Court of Puerto Rico, 695 F.2d 17, 21–25 (1st Cir. 1982). Rather, the judges are sued as enforcers of the statutes, in other words as administrators of the parole power. … Where a suit challenges "statutes related to the judicial process or statutes previously enforced by the particular judge against the plaintiff," judges are proper parties. *In re Justices*, 695 F.2d at 23.10

*Id.* at 1087-88 (additional citations omitted).

Again, according to Defendants they are simply enforcing a state statute which allows them to terminate of suspend custody—which is obviously a "statute related to the judicial process."   Like the judicial defendants in *Georgevich*, the judicial defendants in the instant case do not issue an order and move on, they have constant supervisory and enforcement power over the orders which they crafted.   The comments regarding Supreme Court cases, that follow the above quote, are even more telling.   In addition to discussing *Pulliam*, *Georgevich* further explained:

> Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), is even more analagous to this case since plaintiffs there employed a suit against state judges as the vehicle to enforce their procedural due process rights. Plaintiffs, Florida arrestees who complained about the failure to accord them preliminary probable cause hearings, filed a class action against justices of the peace and judges of small-claims court, as well as against certain law enforcement officers. 420 U.S. at 107 & n. 8, 95 S.Ct. at 859 & n. 8. Plaintiffs' demand in that case was similar to that presented here, i.e., implementation of due process procedures in state judicial proceedings.

20

*Id.* at 1088.

Although a full consideration of *Gerstein* is beyond the scope of this brief,[5] the Third Circuit's en banc opinion quoted above are quite obvious: judges are proper defendants to challenge the adequacy of "due process procedures in state judicial proceedings."

Finally we turn the Third Circuit's opinion in <u>Brandon E. ex rel. Listenbee v. Reynolds</u>, 201 F.3d 194, 196-97 (3d Cir. 2000). *Brandon* appeared to rest its decision on the conclusion that 42 U.S.C. § 1983 provided for declaratory relief but that relief was not available when a judge sat merely as an adjudicator.   Thus *Brandon* implicitly ruled that there was Article III jurisdiction

Of course, one major difference between *Brandon* and the instant case is

---

[5] Unlike *Pulliam*, where the court explicitly mentioned the case or controversy requirement, *Gerstein* is one of a host of cases where the Court tacitly permitted suit against a state judge to vindicate due process rights. The Supreme Court discussed the procedural history of how various state court judges were named as defendants as unremarkable. <u>Gerstein</u>, 420 U.S. at 107.  The Court also noted that: "The District Court correctly held that respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions."  *Id* at 108 n9.  The Court explicitly confirmed lower courts had "jurisdiction":

> Although this ruling held a statewide 'legislative rule' unconstitutional, it was not outside the jurisdiction of a single judge by virtue of 28 U.S.C. s 2281. The original complaint did not ask for an injunction against enforcement of any state statute or legislative rule of statewide application, since the practice of denying preliminary hearings to persons charged by information was then embodied only in judicial decisions. The District Court therefore had jurisdiction to issue the initial injunction, and the Court of Appeals had jurisdiction over the appeal.

that in *Brandon* the plaintiffs appeared to be just attacking the constitutionality of

the statute, Act 53.    At least as the court of appeals described the suit in *Brandon*,

plaintiffs do not appear to have challenged any judicial policies or procedures, but

only attached the statute.    That fact would distinguish *Brandon* from *Pulliam*, and

*Gerstein* (and the instant suit) where the policies and procedures of the judges

denying due process are at issue.

 The central holding of *Brandon* was entered as follows:

> In presiding over Act 53 petitions, the judges do not initiate the
> proceedings against the minor. The proceedings must be undertaken
> by the minor's parent or legal guardian by filing a petition setting
> forth "sufficient facts and good reason for the commitment." *See* 71
> Pa. Cons.Stat. Ann. § 1690.112a(a). To emphasize the informality of
> the proceedings and minimize their adversarial character, the petition
> does not require an attorney at law or a prosecuting attorney. Judges,
> however, are required to appoint counsel for the minor and order an
> assessment of his or her alleged drug or alcohol dependency. *See* 71
> Pa. Cons.Stat. Ann. § 1690.112a(b). When the assessment has been
> completed, the statute requires the judge to hold a hearing and make
> factual determinations. *See* 71 Pa. Cons.Stat. Ann. § 1690.112a(c).
> The judge must determine whether the minor is a "drug-dependent
> person," a mixed question of law and fact typical to the adjudicative
> setting. *See id.* The judge must also determine whether the minor is
> unwilling or unable to accept voluntary treatment services. *See id.*
> Finally, the judge must determine whether the minor will benefit
> from involuntary treatment services. *See id.*

*Id.* at 199.

 Accordingly, the Third Circuit appeared to emphasize that the judges in

*Brandon* had very little discretion and were required to follow specific procedures.

---

*Id* at 108 n.10.  As the Third Circuit did more explicitly, the Supreme Court

In contrast here, the custody statute vests enormous discretion to family court judges. NJ Stat. 9:2-4 provides that (while requiring that rights of both parents be equal) the family court judge may award "b.Sole custody to one parent with appropriate parenting time for the noncustodial parent; or c. Any other custody arrangement as the court may determine to be in the best interests of the child.") This type of unfettered discretion is very far removed from the narrow range of discretion in *Brandon*.

Perhaps more importantly, because Brandon was a challenge to a statute, the Court of Appeals assumed that all of the actions of the judges were in compliance with all statutory requirements. In stark contract, in the instant suit, the judicial defendants do not follow the statutory requirements for specific findings or the case law requirements for a plenary hearing.

Again NJ Stat. 9:2-4 provides, inter alia, that:

> In any proceeding involving the custody of a minor child, the rights of both parents shall be equal and the court shall enter an order which may include:
> …
> c.Any other custody arrangement as the court may determine to be in the best interests of the child.
> In making an award of custody, the court shall consider but not be limited to the following factors: …
> f.The court shall specifically place on the record the factors which justify any custody arrangement not agreed to by both parents.

As described in the Complaint, defendant judges did not treat parents

---

expressed its approval with the procedures in the lower courts.

equally, and deprived defendants of custody in violation of 9:2-4(c) and (f) by failing to consider <u>any</u> (much less all) of the factors listed in (c) and failing to place what their considerations were on the records.   *See, e.g*, Compl. A104, ¶ 54 (Bennett order by Court to relinquish custody rights without any findings of fact or conclusions of law) A117, ¶ 185 (Defendant Judge Sogluizzo denied custody for no apparent reason).   In one instance Judge Tomasello designated some third party to decide custody ordering "Mrs. Kearney to pick the dates for parenting time to take place."  Compl. A102, ¶¶ 31-32.

Far from the orderly administration of justice described in Brandon, the Complaint describes a constitution free zone in family court where, laws rule and constitutional provisions are disregarded along with due process in pursuit of quick adjudications—presumably for no better reason that that defendant judges were too busy to hold hearings and make findings.

In *Brandon* the Court also set forth the process which the court followed:

> Upon petition, the court assigned to hear the matter must appoint counsel for the minor. *See id.* The court also must order the minor who is alleged to have a drug or alcohol dependency to undergo a dependency assessment. *See id.* The assessment is to be performed by a psychiatrist, a licensed psychologist with training in drug and alcohol assessment, or a certified addiction counselor ("CAC"). *See id.* The assessment must include a recommended level of care and length of treatment.

*Brandon*, 201 F.3d at 196.

Nothing like these procedures happened in the instant case.  Plaintiffs were

24

denied custody without the benefit of counsel or experts any sort of expert report

or any sort of independent assessment.  *See*, e.g., A113, ¶ 139.  The instant suit is

factually and procedurally different from *Brandon* but just like *Pulliam*.

**4.  The Court erred in ruling that the demand for injunctive relief should be dismissed because there was an adequate remedy at law, however there was no adequate remedy at law particularly for purposes of section 1983**

The district court ruled that the plaintiffs were not entitled to injunctive

relief because they (allegedly) could have appealed their custody issues in state

court.  This ruling was incorrect because 1) appeal of state court action is not

required to invoke section 1983 protection, and 2) none of the plaintiffs had a

right to appeal because none of the decisions were final.

In Wooley v. Maynard, 430 U.S. 705 (1977), Maynard was prosecuted in

state court three times for covering up a segment of his license plates.  He was

convicted each time, and did not appeal. Maynard filed suit in federal court, to

prevent the state from prosecuting him to covering up the state slogan on his

license plates.  Notable, as here, Maynard did not ask the federal court to set aside

his three convictions in state court.  He only sought prospective relief—as here.

The Supreme Court held that Maynard's failure to appeal his state conviction did

not preclude remedy under section 1983.  *See also Georgevich*, 772 F.2d at 1085

("litigants who properly seek redress in federal court under 42 U.S.C. § 1983

(1982) are not required to exhaust state judicial or administrative remedies.")

Moreover, a right to appeal a custody decision does not exist unless there is

a final custody determination.   In other words, parents stripped of custody in family court have no right to appeal until the custody determination is final. N.J. Ct. Rules 2:2-3; 5:8-6. Although in divorce proceedings the custody issue may be bifurcated from other issues this is discretionary.  N.J. Ct. 5:8-6. ("The court may, in order to protect the best interests of the children, conduct the custody hearing in a family action prior to a final hearing of the entire family action.") N.J. Ct. Rule 2:2-3 provides for an appeal of right only from final custody determinations:

Because the custody orders giving rise to this suit were not final, a parent who is stripped of custody has no right to appeal, but "the Appellate Division may grant leave to appeal, in the interest of justice" N.J. Ct. Rule 2:2-4. Because the Appellate Division has discretion "in the interest of justice" to hear an interlocutory appeal, this is an equitable remedy. Because interlocutory appeals are an equitable remedy, not a remedy at law to address the on-going violations of parental rights.  Indeed, one of the problems with the denial of familial rights without due process is the very lack of a right to appeal.  As a factual matter, the Appellate Division rarely hears interlocutory appeals especially from family courts.  As a result, Plaintiffs had no adequate remedy at law.

**5.  The Court erred in dismissing the Complaint with prejudice for failure to name an appropriate enforcement official without specifying who that official might be and without permitting amendment of the complaint to name an "appropriate official."**

The Third Circuit requires dismissal to be <u>without prejudice</u> unless

amendment would be clearly futile. *In re New Jersey Title Ins. Litig*., 683 F.3d 451, 462 (3d Cir. 2012).  If there were some other state official, or anyone for that matter, who would have been a proper defendant in the suit then the district court should have dismissed without prejudice to permit such amendment. *See, e.g*, Georgevich, 772 F.2d at 1087 (permitting similar suit against judges and attorney general).  See also  R.W.T. v. Dalton, 712 F.2d 1225, 1233 (8th Cir. 1983), abrogated by Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827 (1990) ("Here, the plaintiffs' rights can apparently be fully vindicated by an injunction directed solely to the juvenile officer. … Even if there are cases in which the juvenile judge makes such a decision independently, we have no reason to doubt that the judges will comply with our holding that the Constitution requires probable-cause hearings.")

The Supreme Court stated in *Pulliam* "in situations where in their judgment an injunction against a judicial officer was necessary to prevent irreparable injury to a petitioner's constitutional rights, courts have granted that relief." 466 U.S. at 537.  Even as s *In Re Justices* discussed, injunctions against judges as party defendants is appropriate when necessary "to ensure full relief to the parties, but court can avoid this when "complete relief can be afforded by enjoining all other parties." *In re Justices*, 695 F.2d at 23.  While we believe the defendants are proper, in the alternative if this court regards some other person or entity as a possible defendant then this court should vacate the district court order and remand

with instructions to permit further amendment.

**6.  The District Court erred in failing to enter declaratory judgment because Declaratory Judgement under 28 U.S.C. § 2201 is coextensive with Article III jurisdiction which exists here.**

The Declaratory Judgment, 28 U.S.C. § 2201, provides in relevant part:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The Third Circuit has repeatedly emphasized that "the Declaratory Judgment Act 'should have a liberal interpretation.' " U.S. v. Com. of Pa., Dept. of Envtl. Resources, 923 F.2d 1071, 1074–75 (3d Cir. 1991) *(quoting Exxon Corp. v. Federal Trade Commission,* 588 F.2d 895, 900 (3d Cir.1978).

The language of the DJA makes it co-extensive with Article III.    The Supreme Court has also held that the DJA and Article III are co-extensive:

> The federal Declaratory Judgment Act was signed into law the following year, and we upheld its constitutionality in *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Our opinion explained that the phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III. *Id.,* at 240, 57 S.Ct. 461.

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007).  *See also*
Const. Party of Pennsylvania v. Aichele, 757 F.3d 347, 365 (3d Cir. 2014) (same);

The district court in the instant case implicitly held that there was Article III

jurisdiction and dismissed on the basis of the In Re Justice interpretation of section 1983; however, the district court did not explicitly address Declaratory relief under 28 U.S.C. § 2201.  The district court may have assumed that relief under 28 U.S.C. § 2201 and 42 USC § 1983 are coextensive, but if so this was incorrect.  Long before the amendment of § 1983 the Supreme Court indicated that relief under the DJA against state actors is broader and sometimes more appropriate than relief under § 1983.

In *Steffel v. Thompson*, 415 U.S. 452, 466-7 (1974) the Court explained

> [P]laintiffs were dissatisfied with this method of testing the constitutionality of state statutes, since it placed upon them the burden of demonstrating the traditional prerequisites to equitable relief—most importantly, irreparable injury. …
>
> To dispel these difficulties, Congress in 1934 enacted the Declaratory Judgment Act, 28 U.S.C. ss 2201—2202. That Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction and to be utilized to test the constitutionality of state criminal statutes in cases where injunctive relief would be unavailable is amply evidenced by the legislative history of the Act … . The highlights of that history, particularly pertinent to our inquiry today, emphasize that:
>
>> '(I)n 1934, without expanding or reducing the subject matter jurisdiction of the federal courts, or in any way diminishing the continuing vitality of Ex parte Young with respect to federal injunctions, Congress empowered the federal courts to grant a new remedy, the declaratory judgment. . . .
>> 'The express purpose of the Federal Declaratory Judgment Act was to provide a milder alternative to the injunction remedy. . . . [D]eclaratory judgment was designed to be available to test state criminal statutes in circumstances where an injunction would not be appropriate. . . .

This makes clear that plaintiffs' ability to seek declaratory relief against state

court judges is considerably broader than their ability to obtain injunctive relief, and presumably broader than their ability to obtained declaratory relief under § 1983. Accordingly, the district court erred in dismissing the claim for declaratory relief under the DJA without explanation.[6]

## CONCLUSION

For the above reasons, the district court's decision should be reversed and the case remanded for further proceedings.

Respectfully Submitted,

August 1, 2016                     _____/s   Paul A. Clark_____
                                   Paul A. Clark, Counsel for Plaintiffs
                                   NJ Bar # 04261-2011
                                   10 Huron Ave, Suite 1N
                                   Jersey City, NJ 07306
                                   (202) 368-5435

---

[6]  Under certain circumstances a court may decline to enter Declaratory Judgment but only after considering several factors.   U.S. v. Com. of Pa., Dep't of Envtl. Resources, 923 F.2d 1071, 1075 (3d Cir. 1991).  That was not done here.

## CERTIFICATE OF SERVICE

I, Paul A. Clark, hereby certify that on August 1, 2016, Appellants' Brief and

Appendix were served electronically on all counsel of record via ECF.

A copy was also emailed to counsel for defendants at Benjamin Zieman, at

Benjamin.Zieman@dol.lps.state.nj.us.

Counsel for defendants has agreed to waive service of paper copy.


Dated: August 1, 2016                    ____/s Paul A. Clark
                                                     Paul A. Clark


## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(c) of the Federal Rules of Appellate Procedure, I

certify that, according to the word count feature of the Microsoft Word word

processing program, the foregoing Brief contains well under 7796 words, exclusive

of tables.


Dated: August 1, 2016                    ____/s Paul A. Clark
                                                     Paul A. Clark


## CERTIFICATE OF TEXT

I, Paul A. Clark, hereby certify that the text of the electronically filed Brief and the

text of the hard copies of the Brief are identical.

Dated: August 1, 2016                    ____/s Paul A. Clark
                                                     Paul A. Clark

## CERTIFICATE OF A VIRUS CHECK

I, Paul A. Clark, hereby certify that a virus check has been performed on the

PDF file containing the Brief.  The virus check was completed using Virus Total.


Dated: August 1, 2016                    ____/s Paul A. Clark
                                         Paul A. Clark


## CERTIFICATE OF ADMISSION TO BAR

1.  I am a member in good standing of the Bar of the United States
Court of Appeals for the Third Circuit.

2.  Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury
 that the foregoing is true and correct.


Dated: August 1, 2016                    ____/s Paul A. Clark
                                         Paul A. Clark

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Court of Appeals No: 16-2644

Allen, et al,

Appellants

v.

De Bello, et al,

Defendants.

On Appeal from the United State District Court
for the District of New Jersey

**Appellants' Appendix** (volume I)
Pages A1-A78

PAUL A CLARK, ESQ
10 Huron Ave, Suite 1N
Jersey City, NJ 07306
(202) 368-5435
NJ Bar #  04261-2011

Attorney for Appellants

# APPENDIX TABLE OF CONTENTS

**Volume I**

Notice of Appeal (May 26, 2016).................................................................................A1

Order (January 16, 2015) ........................................................................................A3

Opinion  (January 16, 2015).....................................................................................A5

Order (April 27, 2016) ...........................................................................................A41

Opinion (April 27, 2016) ......................................................................…..A43


**Volume II**

Case Information Statement (Feb 5, 2014) ............................................................A79

Amended Complaint (April 14, 2014) .....................................................................A80

Second Amended Complaint (August 7, 2015) .......................................................A99

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____

|  |  |
|---|---|
| ANTHONY ALLEN for himself and as parent of A.A., TODD BENNETT, for himself and as parent of E.B., SCOTT EDELGLASS, SHARIR FELDMAN, for himself and as Parent of A.F. and J.F, WERNER GRAF, for himself and as parent of A.G. and A.G., KARL HAGBERG, for himself and as parent of E.H, A.H. and C.H., CLIFTON HILL, for himself and as Parent of A.H, SAMIR JOSHI, for himself and parent of J.J., J.J and J.J., YEHUDA B. LITTON, SURENDER MALHAN, for himself and as parent of E.M and V.M., CARLY OLIVIER for himself and as parent of M.O, ANTONIO QUINLAN for himself and as parent of K.Q., ZIA SHAIKH for himself and parent of M.S., S.S., and H.S for themselves and on behalf of all others similarly situated, | : Civil Action No. 14-0760 : : JUDGE Freda Wolfson |

          Plaintiffs,

          v.

LAWRENCE DE BELLO, TIMOTHY CHELL, KATHLEEN DE LANEY, JAMES DEMARZO, MADELIN EINBINDER, MARLENE LYNCH FORD, CHRISTOPHER GARENGER, LAWRENCE JONES, SEVERIANO LISBOA, ANTHONY MASSI, JOHN TOMASELLO, SHERRI SCHWEITZER, NANCY SIVILLI, and MAUREEN SOGLUIZZO,

          Defendants.

_____

|  |  |
|---|---|
| ANTHONY ALLEN for himself and as parent of A.A., TODD BENNETT, for himself and as parent of E.B., | : Civil Action No. 15-3519 : : JUDGE Freda Wolfson |

SHARIR FELDMAN, for himself and          :
As Parent of A.F. and J.F, KARL          :
HAGBERG, for himself and as parent of    :
E.H, A.H. and C.H., CLIFTON HILL, for    :
himself and as parent of A.H, CARLY      :
OLIVIER for himself and parent of M.O,   :
ZIA SHAIKH for himself and as parent of  :
M.S., S.S., and H.S for themselves and   :
ON behalf of all others similarly situated, :
                                         :
               Plaintiffs,               :
                                         :
          v.                             :
                                         :
TIMOTHY CHELL, KATHLEEN                   :
DELANEY, JAMES DEMARZO,                   :
MADELIN EINBINDER, LAWRENCE               :
JONES, SEVERIANO LISBOA,                  :
JOHN TOMASELLO, SHERRI                    :
SCHWEITZER, NANCY SIVILLI,                :
and MAUREEN SOGLUIZZO,                    :
                                         :
               Defendants.               :
_____ :

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that ANTHONY ALLEN, ET AL, Plaintiffs

in the above-named consolidated cases, hereby appeal to the United States Court of

Appeals for the Third Circuit from: (1) the January 16, 2015 Order (3:14-cv-00760-

Doc # 22) granting Defendants' motion to dismiss and; and (2) the April 27, 2016

Orders (3:15-cv-03519-Doc # 17 and 3:14-cv-00760- Doc # 44) granting Defendants'

motion to Dismiss amended complaint.

                              Respectfully submitted,
                              /s Paul A. Clark
                              Counsel for all defendants,

Dated:  May 26, 2016

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

|  |  |  |
|---|---|---|
| | : | |
| SCOTT EDELGLASS, et al. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No. 14-760 (FLW)(DEA) |
| v. | : | |
| | : | **ORDER** |
| STATE OF NEW JERSEY, et al., | : | |
| | : | |
| Defendant(s). | : | |

_____ ____:

**THIS MATTER** having been opened to the Court on June 14, 2014, by the State of New Jersey, John L. Call, Jr., Catherine Fitzpatrick, Patricia B. Roe, Michelle M. Smith, Maureen Sugluizo, and Lisa Thornton ("Defendants"), through the John J. Hoffman, Attorney General of New Jersey (Daniel J. Kelly, D.A.G., appearing); it appearing that Scott Edelglass, Werner Graf, Samir Joshi, Yehuda Ben Litton, Surender Malhan, and Antonion Quinlan ("Plaintiffs"), through their counsel Paul Alexander Clark, Esq., oppose the motion; the Court having considered the submissions of the parties; pursuant to Fed. R. Civ. P. 78; for good cause shown; and for the reasons stated in the opinion filed on this date;

**IT IS** on this 16th day of January, 2015,

**ORDERED** that Defendant's Motion to Dismiss is **GRANTED** as follows:

All claims against the State of New Jersey, and all claims for damages against the named Defendants are **DISMISSED WITH PREJUDICE** as barred by the Eleventh Amendment;

All of Plaintiff Edelglass's claims are **DISMISSED WITH PREJUDICE** for lack of standing and as barred by the statute of limitations;

All of Plaintiff Graf's claims are **DISMISSED WITH PREJUDICE** as barred by the statute of limitations;

All of Plaintiff Litton's claims are **DISMISSED WITH PREJUDICE** as barred by the statute of limitations;

Plaintiff Malhan's claims regarding his custody hearings are **DISMISSED WITH PREJUDICE** as barred by the statute of limitations;

Plaintiff Quinlan's claims regarding his custody hearings are **DISMISSED WITH PREJUDICE** as barred by the statute of limitations;

Plaintiff Joshi's claim that he was denied full and equal custody of his children for over a year without due process is **DISMISSED WITHOUT PREJUDICE**;

Plaintiff Quinlan's claims based on the weapons order are **DISMISSED WITHOUT PREJUDICE**;

Plaintiff Malhan's claims regarding the "gag order" are **DISMISSED WITHOUT PREJUDICE**.

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson, U.S.D.J.

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
SCOTT EDELGLASS, et al.                 :
                                        :
                      Plaintiffs,       :
                                        :          Civil Action No. 14-760 (FLW)(DEA)
        v.                              :
                                        :                  **OPINION**
STATE OF NEW JERSEY, et al.,            :
                                        :
                      Defendant(s).     :
_____ :

**WOLFSON**, **United States District Judge**:

        This actions arises out of a three-Count Amended Complaint filed by Plaintiffs Scott

Edelglass ("Edelglass"), Samir Joshi ("Joshi"), Yehuda Ben Litton ("Litton"), Surender Malhan

("Malhan"), Antonio Quinlan ("Quinlan"), and Werner Graf ("Graf") (collectively "Plaintiffs"),

on their own behalf, on behalf of their respective children, and on behalf of all others similarly

situated. Plaintiffs, suing under 42 U.S.C. § 1983, allege constitutional infirmities in the State of

New Jersey's procedures for handling custody disputes between parents. Specifically, Plaintiffs

claim: (Count 1) that they have been deprived of fundamental rights without due process; (Count

2) that the use of the "best interests" standard is unconstitutional when used to deprive parents of

fundamental rights; and (Count 3) that the State of New Jersey treats mothers and fathers

differently, and treats indigent parents who lose custody of their children to the state differently

from indigent parents who lose custody of their children to another parent, in violation of equal

protection.

        Defendants the State of New Jersey ("State"); Michelle M. Smith in her official capacity

as Clerk of the Superior Court of New Jersey; John L. Call, Jr. in his official capacity as the

1

Presiding Judge of the Chancery Division, Family Part of Burlington County; Maureen

Sogluizzo in her official capacity as Presiding Judge of the Chancery Division, Family Part of

Hudson County; Catherine Fitzpatrick in her official capacity as Presiding Judge of the Chancery

Division, Family Part of Mercer County; Lisa Thornton in her official capacity as Presiding

Judge of the Chancery Division, Family Part of Monmouth County; and Patricia B. Roe in her

official capacity as Presiding Judge of the Chancery Division, Family Part of Ocean County

(collectively "Defendants"; Smith, Call, Sogluizzo, Fitzpatrick, Thornton and Roe collectively

"individual Defendants"; Call, Sogluizzo, Fitzpatrick, Thornton and Roe collectively "Jurist

Defendants"), filed a motion to dismiss the Amended Complaint on the basis that the court lacks

jurisdiction under the *Rooker-Feldman* doctrine, the domestic relations exception, and under the

*Younger* abstention doctrine; that most of Plaintiffs' claims are barred by the statute of

limitations; that Plaintiffs lack standing to bring claims for injunctive relief; that Defendants

have sovereign immunity or are not persons within the meaning of 42 U.S.C. § 1983; that

Plaintiffs claims are improperly brought on a theory of *respondeat superior*; that the Jurist

Defendants have absolute immunity; and that all Defendants are entitled to qualified immunity.

For the reasons that follow, the motion to dismiss is granted. Specifically, all claims

against the State of New Jersey and all damages claims against the individual Defendants are

dismissed as barred by the Eleventh Amendment. All of the Plaintiffs' claims against the

individual Defendants are dismissed, without prejudice, because, as pleaded, they are based on a

theory of *respondeat superior*, and therefore fail to state a claim under § 1983. Certain of the

Plaintiffs' individual claims are also dismissed with prejudice: (1) all of Plaintiff Edelglass's

claims are dismissed for lack of standing and as barred by the statute of limitations; (2) all of

Plaintiff Graf's claims are dismissed as barred by the statute of limitations; (3) all of Plaintiff

Litton's claims are dismissed as barred by the statute of limitations; (4) Plaintiff Malhan's claims regarding his custody hearings are dismissed as barred by the statute of limitations; and (5) Plaintiff Quinlan's claims are dismissed as barred by the statute of limitations.

The following claims are dismissed without prejudice: (1) Plaintiff Joshi's claims regarding his custody hearings in Burlington County, (2) Plaintiff Malhan's claims regarding his "gag order," in Essex County, and (3) Plaintiff Quinlan's claims regarding his weapons order in Hudson County.


## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this motion to dismiss, the following facts, taken from the Plaintiffs' Amended Complaint, are assumed to be true. Plaintiffs are all divorced or single fathers who lost custody of their children for at least some period of time. I will briefly describe the facts of each Plaintiff's case.

Scott Edelglass, who resides in Ocean County, is the father of Z.E., who was born in 1994. Am. Compl. at ¶¶ 3, 12. Shortly after Z.E.'s birth, Edelglass petitioned Monmouth County Court for custody; the outcome of that petition is unclear. *Id.* at ¶ 12. However, in 1997, Z.E.'s mother, Erin Fisher, was granted sole custody of Z.E. by the Monmouth County Family Court, and Edelglass was permitted supervised visitation. *Id.* at ¶ 13. Edelglass asserts that he "was not permitted a full opportunity to present evidence or challenge the evidence against him." *Id.* at ¶ 14. In 1998, Edelglass petitioned the court for unsupervised visitation, which was denied without a plenary hearing. *Id.* ¶ 15. In March 2006, Edelglass requested a hearing on his visitation; again the outcome of the request is unclear. *Id.* at ¶ 17. Although Z.E., who is no longer a minor, can

3

now see Edelglass on his own, Edelgass asserts that there was "significant and long-lasting damage to [sic] father-son relationship." *Id.* at ¶ 18.

Werner Graf, a resident of Mercer County, has two children, born in 2004 and 2008, with Lisa Graf, née McComb ("McComb"). *Id.* at ¶¶ 4, 19. On January 9, 2012, McComb filed for an ex parte temporary restraining order ("TRO"), claiming domestic violence. *Id.* at ¶ 20. Graf asserts that the allegations were exaggerated, and that a single instance of corporal punishment was incorrectly included in the testimony. *Id.* at ¶¶ 23–23. The TRO granted full temporary custody to McComb, and denied any and all parenting time, visitations, or contact for Graf and his family. *Id.* at ¶ 24. The hearing for a final restraining order was delayed until May 3 and 10, 2012. *Id.* at ¶ 28. On February 10, 2012, the TRO was amended to permit ten hours of custody time; on March 22, the TRO was amended to permit parenting time every other weekend, subject to the availability of supervisors approved by the court. *Id.* at ¶¶ 28–29. The TRO was dismissed with prejudice in August, 2012, and a 50-50 custody arrangement was agreed upon in September 2012. *Id.* at ¶¶ 33–34. Graf asserts that the nine-month denial of his parental rights, based on McComb's bald allegations, "has likely damaged the father-child relationship." *Id.* at 36–37.

Plaintiff Joshi, who resides in Pennsylvania, is the father of three children, ages 14, 12, and 10. *Id.* at ¶ 6. He and his ex-wife, Christine, filed for divorce in Pennsylvania, but in 2012, Christine asked New Jersey to take jurisdiction. *Id.* at ¶ 38. On or about June 22, 2012, Christine filed an Order to Show Cause in Burlington County Superior Court, with a return date for July 12, 2012. *Id.* at ¶ 39. Joshi allegedly was not properly served, and did not have notice until shortly before the hearing; a request for a continuance was apparently denied. *Id.* at 39–40. On July 12, Joshi appeared telephonically. *Id.* at ¶ 41. He was not permitted to cross-examine Christine, and did not have time to prepare evidence or obtain counsel. *Id.* at ¶ 42. The Superior

4

Court ordered Joshi to hand over physical custody of the children that day. *Id.* at ¶ 43. Joshi requested a revision of the order to give him full and equal custody; on December 4, without a plenary hearing, the Superior Court modified the earlier order to permit supervised visitation. *Id.* at ¶ 44. In the summer of 2013, Joshi again requested full and equal custody, and requested a plenary hearing; the request for a hearing was denied, and Joshi was granted limited parenting time of 14 hours per week. *Id.* at ¶ 45. Joshi asserts that the Superior Court's restrictions on his ability to parent "likely have caused significant and long-lasting damage to [sic] father-child relationship." *Id.* at ¶ 47.

Litton, a resident of Ocean County, is the father of a son, L., born in 1998. *Id.* at ¶¶ 5, 48. Litton and his ex-wife, Linda, were divorced in January 2008, in Monmouth County; the Judgment of Divorce provided for a 50-50 custody split. *Id.* at 49. Linda denied Litton time with his son; following a transfer of jurisdiction to Ocean County, Litton requested that the Ocean County Court enforce the 50-50 custody arrangement. *Id.* Following an *in camera* interview of Litton's son, the court suspended Litton's parenting time indefinitely on May 8, 2008. *Id.* at ¶¶ 50, 52. Some, but not all, of the allegations were made known to Litton, but have not been described to this Court. *Id.* at ¶ 51. No plenary hearing was held. *Id.* at ¶ 53. In March 2010, however, the Superior Court conducted a full hearing and issued a new order, permitting Litton to see his son for a few hours per week; this Order concluded that Linda had "substantially poisoned L[]'s perception of [Litton], thereby causing L[] to reject his father." *Id.* at ¶¶ 54–55 (alterations in original). Litton alleges the restrictions on his ability to see his son likely caused significant and long-lasting damage to the father-child relationship. *Id.* at ¶ 59.

Malhan, a resident of Hudson County, is the father of two children, ages seven and four. *Id.* at ¶ 7. On February 24, 2011, Alina Myronova, the mother of Malhan's children, filed an

Order to Show Cause in Hudson County Superior Court, Family Part, requesting full physical and legal custody. *Id.* at ¶ 60. Malhan had less than two hours' notice of the proceeding, and contested the allegations regarding his lack of fitness to parent. *Id.* at ¶ 62. The court did not permit Malhan to present any evidence, nor did the court order Myronova to produce evidence which Malhan alleged would prove that she was lying. *Id.* at ¶¶ 63–64. On February 24, 2011, Malhan was stripped of physical and legal custody, and permitted one hour per week of supervised visitation at the Hudson County Courthouse. *Id.* at ¶¶ 65–66. According to the Amended Complaint, the Hudson County Family Court "set a further return date of April 1, 2011"; at a hearing on that date, Malhan was again not permitted to cross-examine Myronova. *Id.* at ¶ 68. Myronova retained sole legal and physical custody of the children until June 2012, when she agreed to joint custody. *Id.* at ¶ 69. Ultimately, the Hudson County Family Court also ruled that Myronova's objections to Malhan's taking care of the children was without basis. *Id.* at ¶ 70.

Following the filing of the present suit, Malhan and two other plaintiffs were interviewed by a local television station on February 18, 2014. *Id.* at ¶ 72. On April 4, 2014,[1] the Essex County Superior Court, Family Part, issued a "gag order," which restrained Malhan from discussing any issues surrounding the divorce of custody proceedings with any member of the media, from posting anything regarding this issues on the Internet, and from discussing any aspect of the divorce with his children. *Id.* at ¶¶ 73–74. The court did not hold a plenary hearing, and made no findings specific to Malhan or his children, but found that publicity about divorce proceedings was not in the best interests of the children. *Id.* at ¶ 75.

---

[1] The Amended Complaint gives the date of the "gag order" as February 4, 2014. However, Malhan's previous Motion for Temporary Restraining Order, filed May 6, 2014, provided the correct date.

6

Quinlan, a resident of Hudson County, has a thirteen year old child. *Id.* at ¶¶ 8, 80. On December 3, 2010, the Hudson County Superior Court, Family Part, held a hearing on a motion filed by Quinlan's ex-wife, Kayoi Quinlan Hasebe. *Id.* at ¶ 81. Quinlan was not permitted to testify, present evidence, or cross-examine Hasebe, and the court allegedly relied on hearsay evidence and Hasebe's certifications. *Id.* at ¶¶ 82–84. The Superior Court terminated Quinlan's legal custody of his child. *Id.* at ¶ 80. Quinlan further alleges that through an administrative error, the State of New Jersey has entered an Order in a national database that indicates that Quinlan is subject to a Restraining Order preventing him from having contact with his child, and that the State has refused to correct this error. *Id.* at ¶¶ 86–87. In addition, Quinlan alleges that a conflict of interest occurred during the pendency of the underlying litigation, and that the Superior Court refused to address it. *Id.* at ¶ 89. Finally, Quinlan asserts that the Superior Court has ordered him not to possess any weapons, again without a hearing or any showing that Quinlan's possession of weapons presented a danger. *Id* at ¶ 90.

Plaintiffs filed their initial complaint against Defendants, plus Burlington, Hudson, and Ocean Counties, on February 5, 2014. The First Amended Complaint, which did not list the Counties as defendants, was filed on April 14, 2014; the Counties were terminated as defendants on August 20, 2014. On May 6, 2014, Plaintiff Malhan filed a Motion for a Temporary Restraining Order to enjoin enforcement of the "gag order"; this Motion was denied on May 8th, 2014, for lack of jurisdiction. Defendants then filed the present Motion to Dismiss the First Amended Complaint with Prejudice.

## II. STANDARD OF REVIEW

7

In the instant matter, State Defendants move to dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction under the Federal Rules of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). When a Rule 12 motion "is based on more than one ground, the court should consider the 12(b)(1) challenge first, because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993).

### A. Rule 12(b)(1)

A defendant may move to dismiss a claim for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). There is no presumption of truthfulness that attaches to the allegations of the complaint when determining a challenge to the court's subject matter jurisdiction. *Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Once a 12(b)(1) challenge is raised, the plaintiff bears the burden of demonstrating the existence of subject matter jurisdiction. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006). A Rule 12(b)(1) motion to dismiss is treated as either a "facial or factual challenge to the court's subject matter jurisdiction." *Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Under a facial attack, the movant challenges the legal sufficiency of the claim, and the court considers only "the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." *Id.* Under a factual attack, however, "the challenge is to the actual alleged jurisdictional facts." *Liafom, LLC. v. Big Fresh Pictures*, Civ. No. 10-0606, 2011 U.S. Dist. LEXIS 95251, 2011 WL 3841323 (D.N.J. Aug. 24, 2011).

A factual attack may be made at any time after the answer has been filed. *Mortensen*, 549 F.2d at 891, 891 n.17 ("A factual jurisdictional proceeding cannot occur until plaintiff's

8

allegations have been controverted."). Because Defendants have not filed an answer in this case, their 12(b)(1) motions, namely sovereign immunity, prudential standing requirements, and the *Rooker-Feldman* doctrine, *see* Def. Br. at 11, as well as other abstention doctrines including *Younger* abstention and the domestic-relations exception, must be treated as facial attacks. *See Constitution Party of Penn. v. Aichele*, 757 F. 3d 347, 358 (3d. Cir. 2014) (stating that because attack was filed before any answer to the complaint, motion was "by definition, a facial attack."). Thus, all allegations in the Complaint must be treated as true for the purposes of these issues.

### B. Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a claim for failing to state a basis upon which relief can be granted. Affirmative defenses, such as a statute of limitations, may be raised in a Rule 12(b)(6) motion so long as "the predicate establishing the defense is apparent from the face of the complaint." *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 n.10 (3d Cir. 1978). In deciding a Rule 12(b)(6) motion, "courts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). However, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleading must contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555) (internal citations and quotations omitted). Thus, a complaint will survive a motion to dismiss if it contains "sufficient factual matter, as accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570) (internal citations and quotations omitted). "A claim has

facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Assertions of judicial and qualified immunity, as affirmative defenses which raise "insuperable barriers" to claims, *see Flight Sys., Inc. v. Elec. Data Sys.*, 112 F.3d 124, 127 (3d. Cir. 1997), are analyzed under Rule 12(b)(6). *See, e.g.*, *Green v. Maraio*, 722 F.2d 1013, 1015–19 (3d Cir. 1983). Defendants' motions based upon the statute of limitations, absolute immunity, and qualified immunity, in addition to Defendants assertion that Plaintiffs have failed to state a claim under § 1983 because Plaintiffs' claims are based on a theory of *respondeat superior*, will be discussed under this Rule.


## III. DISCUSSION

### A. The *Rooker-Feldman* Doctrine

Defendants assert that Plaintiff's Complaint improperly attempts to appeal concluded and pending State court proceedings, namely their final or ongoing divorce and custody proceedings. Def. Br. at 14. Defendants argue, therefore, that this Court lacks jurisdiction to hear this case under the *Rooker-Feldman* doctrine. Def. Br. at 14. This doctrine prohibits a district court from exercising federal subject matter jurisdiction in cases "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *ExxonMobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). Defendants note that *Rooker-Feldman* applies "event when federal constitutional issues are at stake." Def. Br. at 14. Plaintiffs argue that this case does not fall within the boundaries of the *Rooker-Feldman* doctrine, because while a federal court may not review a state court decision, it can hear a challenge to a statute or

rule underlying that decision. Pl. Br. at 11. Plaintiffs also argue that *Rooker-Feldman* does not

apply to prospective relief, *id.* at 23, and that the minors on whose behalf the present suit was

brought, namely the children of the named Plaintiffs, were not parties to any of the state

proceedings, *id.* at 24.

The *Rooker-Feldman* doctrine takes its name from two United States Supreme Court

cases. In the first, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), parties who were defeated

in state court requested a federal District Court to declare the state-court judgment "null and

void" because it was allegedly "rendered and affirmed in contravention of the Constitution." *Id.*

at 414–15. Construing the jurisdictional statutes, 28 U.S.C. § 1331 and 28 U.S.C. 1257, and after

finding the state court had jurisdiction, the Supreme Court held that only the Supreme Court

"could entertain a proceeding to reverse or modify the judgment for errors of that character." *Id.*

at 415–16.  In the second case, *District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462

(1983),  the Plaintiffs had petitioned District of Columbia Court of Appeals to waive a bar

admission rule; upon the denial of their petitions, the Plaintiffs each filed complaints in in the

District Court for the District of Columbia. *Exxon-Mobil*, 544 U.S. at 285. The Supreme Court

held that the Plaintiffs' charge that the District of Columbia court had acted arbitrarily in denying

the waiver was not reviewable because "it was "inextricably intertwined with the District of

Columbia Court of Appeals' decisions, in judicial proceedings, to deny [plaintiffs'] petitions." *Id.*

However, the District Court could review the Plaintiffs' claim that the bar admission rule itself

was unconstitutional. *Id.*

The Supreme Court emphasized the narrow applicability of *Rooker-Feldman* in 2005, in

*ExxonMobil Corp. v. Saudi Basic Industries Corp.* Saudi Basic Industries Corp. ("SABIC") had

sued Exxon in state court over a royalties dispute; Exxon had countersued in the District of New

Jersey. 544 U.S. at 289. In state court, Exxon asserted as counterclaims the same claims it had brought in the federal suit. *Id.* SABIC had moved to dismiss the federal suit; the motion was denied and SABIC appealed—after a state trial had already been completed. *Id.* at 289–90. Rejecting reliance on a broad "intextricably intertwined" test, the Supreme Court held that the *Rooker–Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284.

The narrow ground of *Rooker-Feldman* was further emphasized most recently in *Skinner v. Switzer*, 562 U.S. 521 (2011). Skinner, a convicted murderer sentenced to death, attempted to get DNA evidence tested by bringing a § 1983 challenge to the Texas rule barring such testing. *Id.* at 1295. Skinner had twice moved in state court for the evidence to be tested, and was denied both times. *Id.* The Supreme Court permitted the federal suit, stating that "'[i]f a federal plaintiff present[s][an] independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court.'" *Id.* at 1297 (quoting *ExxonMobil*, 544 U.S. at 292–93) (some alterations in original). Jurisdiction was permitted because "Skinner does not challenge the adverse [state court] decisions themselves; instead, he targets as unconstitutional the Texas statute they authoritatively construed." *Id.* at 1298.

Following *ExxonMobil*, the Third Circuit reevaluated its prior holdings on the *Rooker-Feldman* doctrine. In *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, Great Western Mining and Mineral Company had filed a civil rights action asserting that it lost a case in Pennsylvania state court because of a "'corrupt conspiracy' between the named defendants

and certain members of the Pennsylvania state judiciary to exchange favorable rulings for future

employment as arbitrators with . . . an alternative dispute resolution entity." 615 F.3d 159, 160

(3d Cir. 2010). The Third Circuit concluded that *Rooker-Feldman* did not apply. *Id.* Looking to

*ExxonMobil*, the panel found four requirements for the application of the doctrine: "(1) the

federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-

court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the

plaintiff is inviting the district court to review and reject the state judgments." *Id.* at 166

(alteration in original). The panel observed, however, that the question of whether an injury is

"caused by" a state court judgment "becomes more complicated when a federal plaintiff

complains of an injury that is in some fashion related to a state-court proceeding," because "a

federal plaintiff who was injured by a state-court judgment is not invariably seeking review and

rejection of that judgment." *Id.* at 167–68. The panel determined that the claim that "Great

Western was purportedly forced to litigate in a rigged system and could not receive a fair hearing

in Pennsylvania against ADR Options and Rutter, in violation of its constitutional rights" did not

"assert injury caused by state-court judgments and seek review and rejection of those

judgments." *Id.* at 171 (internal quotation marks omitted). Thus, the panel concluded "Great

Western may, 'as part of [its] claim for damages,' show 'that the [constitutional] violation caused

the decision[s] to be adverse to [it] and thus did [it] harm.' A finding by the District Court that

state-court decisions were erroneous and thus injured Great Western would not result in

overruling the judgments of the Pennsylvania courts." *Id.* at 173 (alterations in original)(citation

omitted).

Most recently, in a case strikingly similar to the current one, the Third Circuit held that

*Rooker-Feldman* did not bar a suit for violation of substantive and procedural due process. *B.S.*

*v. Somerset Cnty.*, 704 F.3d 250 (3d Cir. 2013). Following allegations of physical neglect, the Somerset County Children and Youth Services obtained an order, ex parte, from a Pennsylvania state court judge transferring a daughter from her mother's custody, to her father. *Id.* at 255. Under Pennsylvania law, no hearing was required because the custody was transferred to another parent, not to the state. *Id.* 256. The mother sued the County and two of its employees for violating her rights to substantive and procedural due process. *Id.* at 259. The Third Circuit held that *Rooker-Feldman* did not apply because "the injury Mother claims is . . . traceable to Appellees' actions, as opposed to the state court orders those actions allegedly caused." *Id.* at 260.

Applying the *Great Western* four-part test to the case at hand, *Rooker-Feldman* does not apply to the claims presented in this case regarding custody hearings. On the first prong, whether the federal plaintiff lost in state court, the answer is not entirely clear. Certainly the Plaintiffs initially lost in state court; however, in at least some of the cases, the Plaintiffs succeeded in getting those decisions reversed, in whole or in part. Furthermore, as Plaintiffs point out, to the extent that the suit also brings claims on behalf of the Plaintiffs' minor children, the children were not parties to the initial state actions. More importantly, as to the second prong, as defined by *Great Western*, the plaintiffs do not complain of injuries caused by the state-court judgments. Rather, as in *Great Western*, they complain that they were "forced to litigate in a rigged system." 615 F.3d at 171. Like the litigants in *Skinner*, the Plaintiffs are not challenging the state court judgments, but the underlying policy that governed those judgments—namely, the alleged policy of the New Jersey State Courts of stripping parents of custody, in favor of another parent, without a plenary hearing. *See Skinner*, 562 U.S. at 1298; *see also B.S.*, 704 F.3d at 260. For the same reason, it cannot be said, under the fourth prong, that the plaintiff is inviting the district

14

court to review and reject the state judgments. The fact that, under the third prong, some of the judgments were rendered before the federal suit was filed is largely immaterial here.

In addition to the custody assertions, Plaintiff Malhan asserts that he was subject to a "gag order" without due process; similarly, Plaintiff Quinlan asserts that he is subject to an order "not to possess any weapons" that was issued without any type of hearing, and that he is harmed by an administrative error which incorrectly shows that he is subject to a restraining order. These claims, too, are subject to the four-prong *Great Western* test. Here, the Plaintiffs lost in state court. However, like the custody claim, Malhan and Quinlan do not claim that they suffered injury directly from the orders; rather, they claim that the system was rigged—that each was respectively deprived of his "First and Second Amendment rights under color of law under the theory that 'best interests of the child' trump any and all fundamental rights, and . . . without a plenary hearing or specific findings." Am. Comp. at ¶ 116. Similarly, the Plaintiffs are not inviting review and rejections of the orders themselves, but of the process used to issue them.

For these reasons, Defendants' argument that this case should be dismissed pursuant to the *Rooker-Feldman* doctrine must be denied.

### B. The Domestic Relations Exception

Defendants next argue that this Court does not have subject matter jurisdiction under the domestic relations exception to federal jurisdiction. Def. Br. at 18. According to Defendants, the domestic relations exception applies because Plaintiffs' claims "implicate the Family Part's special expertise in dealing with child custody in family law disputes," and would require this Court to "make determinations about child custody proceedings and State family law." *Id.* at 20. Plaintiff, however, asserts that in the Third Circuit, the domestic relations exception applies only to cases brought under diversity jurisdiction. Pl. Br. at 27.

The domestic relations exception to federal diversity jurisdiction was first raised in *Barber v. Barber*, 21 How. 582, 16 L. Ed. 226 (1859). In 1992, the Supreme Court explained that the domestic relations exception, as applied by the federal courts since *Barber*, "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992). More recently, the Supreme Court acknowledged that "it might be appropriate for the federal courts to decline to hear a case involving elements of the domestic relationship, even when divorce, alimony, or child custody is not strictly at issue: This would be so when a case presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 (2004) (internal quotation marks and citations omitted). However, the Supreme Court further stated that "rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue, *see, e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 432–434, (1984), [though] in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts." *Id.*

There is a split among the Circuit Courts of Appeal as to whether the domestic relations exception applies only to cases brought under diversity jurisdiction or to any case that would otherwise have federal subject matter jurisdiction. *See* Meredith Johnson Harbach, *Is the Family a Federal Question?*, 66 Wash. & Lee. L. Rev. 131, 147 (2009) (noting circuit split and listing cases). However, the Third Circuit has limited the domestic relations exception to diversity: "'as a jurisdictional bar, the domestic relations exception does not apply to cases arising under the Constitution or laws of the United States.'" *McLaughlin v. Pernsley*, 876 F.2d 308, 312 (3d Cir. 1989) (quoting *Flood v. Braaten*, 727 F.2d 303, 308 (3d Cir. 1984)).

16

Accordingly, since this case is brought under federal question jurisdiction, raising constitutional claims under § 1983, the domestic relations exception does not apply.

### C. *Younger* Abstention

Defendants assert that this Court should decline jurisdiction under the *Younger* abstention doctrine, which requires federal court abstention from ongoing state court proceedings or where a plaintiff failed to exhaust his state remedies. Def. Br. at 21–22. Defendants claim that abstention is proper here because the New Jersey State courts have continuing jurisdiction over Plaintiffs' ongoing child custody and divorce proceedings. *Id.* at 22. Additionally, Defendants assert that the state's administration of its child custody and domestic relations law is an important state interest. *Id.* at 24. Defendants further assert that the Plaintiffs failed to avail themselves of the state appeals process, and that there is no evidence of bad faith, harassment, or other extraordinary circumstances. *Id.* at 25–26. Plaintiffs assert that *Younger* abstention does not apply, as this case does not involve a criminal prosecution, a civil enforcement action, or a civil proceeding uniquely in furtherance of the state courts' ability to perform their judicial functions. Pl. Br. at 30–31.

*Younger* abstention derives its name from *Younger v. Harris*, 401 U.S. 37 (1971). In that case, the plaintiff, who had been charged under the California Criminal Syndicalism Act, filed suit in federal district court requesting that his prosecution to be enjoined because the law was unconstitutional. *Id.* at 41. The Supreme Court cited 28 U.S.C. § 2283, which generally prevents a federal court from staying proceedings in a state court.[2] *Id.* at 43. Underlying this policy, the Supreme Court declared, was "the basic doctrine of equity jurisprudence that courts of equity

---

[2] Specifically, § 2283 states: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44. The Supreme Court held that "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45. Thus, because the plaintiff there was faced with an injury "incidental to every criminal proceeding brought lawfully and in good faith" he was "not entitled to equitable relief even if such statutes are unconstitutional." *Id.* at 49 (internal quotation marks omitted).There are, however, exceptions to *Younger* abstention for bad faith and harassment *Id.* at 53. Similarly, in the unusual case of a statute which is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it," abstention would not be warranted. *Id.* at 53–54.

More recently, the Supreme Court expanded the *Younger* abstention doctrine to two categories of cases, in addition to ongoing criminal prosecutions: "certain 'civil enforcement proceedings,'"; and "pending "civil proceedings involving certain orders ... uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013). Such civil enforcement proceedings include, for example "a civil action in state court to abate the showing of obscene movies which was in aid of and closely related to [the State's] criminal statutes." *Id.* (citing *Huffman v. Pursue*, Ltd., 420 U.S. 592 (1975)). Civil proceedings in furtherance of a state court's ability to perform judicial functions are exemplified by contempt orders. *See Juidice v. Vail*, 430 U.S. 327 (1977). Thus, in 2013, the Supreme Court clearly limited *Younger* abstention to the above delineated three categories. *Sprint*, 134 S. Ct. at 591. According to the Supreme Court, "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.*

18

(internal alterations quotation marks, and citation omitted). "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Id.* at 588.

In *Sprint*, the Supreme Court expressly restrained the Circuit Courts of Appeals' reliance on its previous decision in *Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423 (1982). That decision had been interpreted as warranting *Younger* abstention if three conditions were met: "(1) "an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges." *Sprint*, 134 S. Ct. at 593. The Supreme Court stated that these conditions were "not dispositive" but were "*additional* factors appropriately considered by the federal court before invoking *Younger*." *Id.* The Supreme Court warned that "[d]ivorced from their quasi-criminal context [bar disciplinary proceedings], the three *Middlesex* conditions would extend Younger to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest," and accordingly limited *Younger* abstention to the three circumstances identified above. *Id.*

The Family Court proceedings underlying the present case do not fall under any of the three categories delineated by the Supreme Court in *Sprint*.[3] The same is true of the "gag order" against Malhan, the order not to possess weapons against Quinlan, and the allegedly erroneous record showing a restraining order against Quinlan. These proceedings were not criminal proceedings. Nor were they civil enforcement proceedings, as there was no claim that Plaintiffs

---

[3] Indeed, in neither the original brief nor the reply brief did Defendants' counsel cite *Sprint* or any cases following *Sprint*, choosing instead to rely on the three *Middlesex* factors which were expressly repudiated as dispositive by the Supreme Court. This omission is striking, as Plaintiffs' counsel pointed out that the cases in Defendants' original brief had been at least called into question by *Sprint*. *See* Pl. Br. at 30.

violated any civil statute. Finally, the Family Court proceedings and orders at issue here are not analogous to contempt hearings, and therefore do not fall into the category of proceedings which further the state's ability to perform judicial functions. As the case does not fall into any of the "exceptional" categories to which *Younger* abstention applies, Defendants' motion to dismiss the case on this ground is denied.

### D. Standing

Defendants argue that Plaintiffs lack standing to bring claims for injunctive relief on behalf of "presumed future plaintiffs." Def. Br. at 27. According to Defendants, Plaintiffs' claim relies on the speculative assertion that the New Jersey Family Part courts will not provide due process or equal protection to future fathers in child-custody actions. *Id.* at 29. To the extent that Plaintiffs seek relief in their own cases, Defendants assert that such claims are moot because any constitutional violations resulting from court orders were cured by subsequent orders amending the child custody arrangements, or because the child reached the age of majority. *Id.* at 29–30. Plaintiffs argue that they have been actually injured in the past, and are subject to future proceedings which will use the same unconstitutional procedures. Pl. Br. at 35.

To satisfy the "case or controversy" standing requirement under Article III, a plaintiff must establish that he or she has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. In the jurisprudence of standing, a "litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75 (1982); *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538 (3d Cir. 1994). A plaintiff will fail to meet this requirement if the plaintiff merely raises a "generally available

grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992).

When a plaintiff seeks prospective injunctive relief, his or her standing to seek the injunction depends on whether he or she is likely to suffer future injury from the behavior sought to be enjoined. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *see also Pennsylvania Prison Soc. v. Cortes*, 508 F. 3d 156, 166–67 (3d Cir. 2007). In *Lyons*, for example, the plaintiff sued the City of Los Angeles claiming that police officers had applied a "chokehold" to him at a traffic stop, without justification. *Lyons*, 461 U.S. at 97–98. The plaintiff sought, among other relief, "a preliminary and permanent injunction against the City barring the use of the control holds." *Id.* at 98. The United States Supreme Court held that the plaintiff did not have standing to seek the injunction. *Id.* at 105. Noting its prior holding that "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects,'" *id.* at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)), the Supreme Court found that the fact that Lyons had been choked by the police in the past "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105. The Supreme Court further stated that "[t]he additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.*

21

at 106. To establish a case or controversy, Lyons needed to allege that he was likely to have another encounter with the police, and also either "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." *Id.*

The initial inquiry in a putative class action suit is whether the lead Plaintiff has standing individually. *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007); see also *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). Therefore, I must determine whether any of the named Plaintiffs has standing to assert his claims.

Defendants do not dispute that Plaintiffs have standing to assert claims for damages for their past injuries, only that they lack standing for injunctive relief. I disagree, and find that, under the *Lyons* rule, most of the named Plaintiffs have shown facts sufficient to demonstrate a case or controversy with Defendants for injunctive relief. With the exception of Edelglass, whose child is no longer a minor, all of the Plaintiffs have alleged that they currently have minor children. Accordingly, the state courts maintain jurisdiction over Plaintiffs' child custody matters. N.J. Stat. Ann. § 2A:34-23. Plaintiffs, unlike the plaintiff in *Lyons*, can therefore show that they are likely to have another encounter with the Family Part courts. Plaintiffs have alleged that the state courts have a policy of denying parents a plenary hearing when one parent loses custody to the other parent. Am. Compl. at ¶ 102. Plaintiffs further allege that this policy is authorized by the New Jersey Supreme Court and Appellate Division. *Id.* at ¶¶ 100–101. Therefore, Plaintiffs have alleged that they are likely to suffer such an injury again. For the same

22

reason, their claims are not moot. Under the standing rule of *Lyons*, Plaintiffs, with the exception of Edelglass, have shown that they have a live case or controversy.

Plaintiff Edelglass can make no such showing. His only child has already reached the age of majority, and, as the complaint acknowledges, can now choose to see his father of his own accord. Am Compl. at ¶ 16. Edelglass cannot again lose custody without a plenary hearing, and therefore his claims for injunctive relief must be dismissed.

As to all other named Plaintiffs, however, Defendants' motion to dismiss the case on standing grounds is denied.

### E. Sovereign Immunity

Defendants assert that they are protected by sovereign immunity, and therefore all claims must be dismissed. First, Defendants assert the State and the state officers who act on its behalf are protected by the Eleventh Amendment. Def. Br. at 30–31. Defendants argue that the Eleventh Amendment also bars recovery under § 1983. Defendants next claim that neither the State, the Jurist Defendants, nor Defendant Smith are "persons" amenable to suit under § 1983. *Id.* at 32. Plaintiffs counter that the Eleventh Amendment is no bar to prospective injunctive relief against either a State or its officials. Pl. Br. at 35–36. Plaintiffs also contend that the Eleventh Amendment is not a bar to actions arising "directly under the equal protection clause of the Fourteenth Amendment,"*id.* at 36, and that the Eleventh Amendment does not bar suits against state officials in their individual capacities. *Id.* at 37.

Plaintiffs incorrectly argue that the Eleventh Amendment does not bar prospective injunctive relief against a State, because while § 1983 permits suits against persons acting under color of state law, the Supreme Court has held that a State is not a "person" within the meaning of the statute. *Will v. Michigan Dep't of State*, 491 U.S. 58, 65 (1989). The Supreme Court

concluded that "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity." *Id.* at 66. Therefore all claims asserted directly against the State of New Jersey are dismissed.

Suits against state officials are more complex. It is true, as Plaintiffs assert, that state officials sued in their individual capacities are "persons" under § 1983, and thus suits against them are not barred by the Eleventh Amendment. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). However, Plaintiffs have not sued any of the Defendants in their individual capacities. Thus, this argument is unavailing. Furthermore, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal citations omitted). However, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. at 167 n.14 (1985)). Thus, the only § 1983 suits that may proceed against a state official, sued in his or her official capacity, are suits for injunctive relief rather than monetary damages.

Plaintiffs are suing both for monetary damages and for injunctive relief. To the extent that Plaintiffs have made claims for monetary damages against either the State or state officials acting in their official capacity, these claims are barred by the Eleventh Amendment and must be dismissed. Additionally, Plaintiff Quinlan's claim that the State of New Jersey erroneously entered him into a database showing a restraining order against him, lies solely against the State, and not against any of the individual Defendants. Thus, that portion of Quinlan's claim must be dismissed. However, Plaintiffs' remaining actions against the individual Defendants, sued in their official capacities for injunctive relief, which involve Plaintiffs' custody hearings, and the

24

claims regarding the "gag" order and the weapons order, are not actions against the State, and are therefore not barred by the Eleventh Amendment.

### F. Respondeat Superior

Closely related to the sovereign immunity claim is Defendants' argument that Plaintiffs' claims under § 1983 against the individual Defendants are premised on a theory of *respondeat superior*, and therefore cannot be maintained. Def. Br. at 34–35. The individual Defendants are the Presiding Judges of their respective Counties, and the Clerk of the New Jersey Superior Court; none of the Defendants presided over Plaintiffs' custody hearings, nor did they enter any of the orders which are the source of the Plaintiffs' claims. For that reason, Defendants assert that Plaintiffs have failed to allege that any of the individual Defendants personally engaged in any specific conduct which resulted in the denial of Plaintiffs' rights. *Id.* at 35. Plaintiffs dispute Defendants' contention that their case is based on a *respondeat superior* theory. Pl. Br. at 37. Instead, Plaintiffs argue, that Defendants, in their capacities as Presiding Judges and Clerk of the Superior Court, directly caused their injuries by promulgating and enforcing a policy of not providing plenary hearings for a parent stripped of custody in favor of another parent. *Id.*

Liability for a § 1983 claim cannot be premised solely on a theory of *respondeat superior*; rather "an individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (internal quotation marks and citation omitted). However, a supervisor, whether an individual or an entity, may be liable for a constitutional violation under § 1983 if the supervisor is "the moving force" behind the violation. *Sample v. Diecks*, 885 F.2d 1099, 1116–17 (3d Cir. 1989) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). Moreover, "a 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate unless that 'person'—

Appellants' Appendix page　A29

whether a natural one or a municipality—has exhibited deliberate indifference to the plight of the person deprived." *Id.* at 1118 (quoting *City of Canton*, 489 U.S. at 389). In addition, "liability may be imposed where the risk of constitutional violations is so great and obvious that deliberate indifference can be inferred from that risk and the [defendant]'s failure to address it." *Id.* at 1117. However, "[a] civil rights plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a relationship between the identified deficiency and the ultimate injury." *Rodriguez v. Town of West New York*, 191 Fed. App'x 166, 168 (3d Cir. 2006) (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir.2001)).

Alternately, "when a policymaking official establishes a constitutionally inadequate state procedure for depriving people of a protected interest and someone is thereafter deprived of such an interest, the official has 'subjected' that person to a due process violation." *Sample*, 885 F.2d at 1114 (3d Cir. 1989). When an official authorizes an unconstitutional procedure, there is no state-of-mind requirement; all that is required is that "the official authorizes a system with the intention that it will operate to deprive persons of life, liberty, or property, whether or not he intends the deprivation to be without due process of law." *Id.* However, before the official can be held liable, it must be shown that "he is responsible for establishing or maintaining a state process that does not comport with due process." *Id.* at 1116.

The argument that a § 1983 suit cannot be maintained on a theory of *respondeat superior* is analyzed under Rule 12(b)(6). Therefore, I must examine the allegations of the Complaint in the light most favorable to Plaintiffs. I note that Defendants have not moved under Rule 12(b)(6) claiming that these claims do not state violations as a matter of law; the question is whether the Plaintiffs have stated a claim against these individual Defendants, in their official capacity, or if

the claim is dependent on the unavailable theory of *respondeat superior.* Plaintiffs allege in Count 1 that Defendants "have established policies, procedures, and precedents denying parents a full and prompt hearing when stripping one parent of physical and legal custody and giving full physical and legal custody to another parent." Am. Compl. at ¶ 107. Counts 2 and 3 "re-allege previous paragraphs as fully stated," and therefore include this allegation. Under either the supervisory responsibility rubric or under the analysis of whether the policymaking official established an unconstitutional process, I find that this allegation is insufficient to make out a claim under § 1983 for a violation of due process with respect to custody hearings, because Plaintiffs have failed to specifically allege how the individual Defendants are responsible for this policy. The fact that the individual Defendants are Presiding Judges, or the Clerk of the Superior Court, is not enough, in and of itself, to make out a claim against them. Plaintiffs must either "identify specific acts or omissions of the supervisor that evidence deliberate indifference" *Rodriguez*, 191 Fed. App'x at 168, or allege facts that demonstrate that these individual Defendants are "responsible for establishing or maintaining a state process that does not comport with due process." *Sample*, 885 F.2d at 1116. This Complaint can be maintained only if Plaintiffs can point to specific actions by these individual Defendants, acting in their official capacities, which established the policies that led to their denial of due process. Broad allegations that parents are often denied their rights in New Jersey, or citations to New Jersey Supreme Court cases do not suffice to show that these individual Defendants, in their official capacities, caused Plaintiffs' due process violations. Without such allegations, Plaintiffs' Amended Complaint can only be read to assert that the individual Defendants were responsible for Plaintiffs' violations because they held supervisory positions over the judges who presided in the Plaintiffs' cases—in other words, that they are liable under *respondeat superior.*

27

Moreover, Plaintiffs' allegation that Defendants "have established policies, procedures, and precedents" is limited only to their claims regarding custody hearings. With respect to Plaintiffs Malhan and Quinlan's claims that their First and Second Amendment rights were violated, Plaintiffs have not alleged that any of the individual Defendants are responsible for the policy underlying the alleged violation. Plaintiffs merely assert that the application of a "best interest standard" to strip parents of "other fundamental rights, such as free speech" "is widespread enough to constitute a policy." Again, unless the individual Defendants can be shown to be the "moving force" behind the alleged policy, they cannot be held liable under § 1983. No such assertions are made in the Amended Complaint

Thus, Plaintiffs' claims are based on a theory of *respondeat superior*, and Defendants' motion to dismiss for failure to state a claim on that ground is granted.

### G. Statute of Limitations

Although all claims have been dismissed because they sound in *respondeat superior*, dismissal on those grounds is without prejudice. Therefore, I will examine the question of the statute of limitations, in order to determine whether any of Plaintiffs' claims should be dismissed with prejudice. Defendants assert that the claims of five of the six Plaintiffs are barred by the statute of limitations. Def. Br. at 26. Defendants contend that "each cause of action arose on the date when Plaintiffs allegedly lost custody of their children," and that each of those dates occurred prior to the two-year statute of limitations date. *Id.* at 26–27. Plaintiffs assert, however that the statute of limitations does not bar prospective relief. Pl. Br. at 33. Plaintiffs further argue that the statute of limitations which should be applied is the six-year "catch-all" provision, N.J. Stat. Ann. § 2A:14-1. *Id.* at 34. Finally, Defendants maintain that the deprivation of their parental rights was a continuing violation, and thus continued to accrue following the court orders. *Id.*

28

The statute of limitations in an affirmative defense, under Federal Rule 8(c). "Under the law of this and other circuits, however, the limitations defense may be raised on a motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (quoting *Hanna v. United States Veterans' Administration Hospital*, 514 F.2d 1092, 1094 (3d Cir. 1975)). Although § 1983 provides a federal cause of action, the statute of limitations to be applied is the one "which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *see also Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (stating that for § 1983 claim arising in New Jersey, two-year personal injury statute applies, not six-year residual statute). In New Jersey, the personal-injury tort statute of limitations is two years. N.J. Stat. Ann. § 2A:14-2.

"Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). However, "when the jurisdiction of the federal court is concurrent with that of law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations." *Russell v. Todd*, 309 U.S. 280, 289 (1940). Although § 1983 provides for both monetary damages and injunctive relief, very few courts have examined whether claims for injunctive relief are also barred by state statutes of limitations. The most recent federal appellate case comes out of the Fifth Circuit, where death row inmates filed a § 1983 claim challenging Mississippi's lethal injection protocol. *Walker v. Epps*, 550 F.3d 407, 408 (5th Cir. 2008). The State of Mississippi asserted a statute of limitations defense; the plaintiffs contended, *inter alia*, that because they sought only equitable relief, the statute of limitations did not apply. *Id.* at 410.

29

The Fifth Circuit, citing *Wilson v. Garcia*, 471 U.S. 261 (1985), applied the statute of limitations bar:

> The Supreme Court was fully aware when it decided Wilson that actions seeking equitable relief only could be brought under § 1983. If the Supreme Court had intended to exclude such actions from its rule, it would have explicitly stated so in *Wilson*. It is plain, however, that the Court, in directing courts in each state to select "the one most appropriate statute of limitations for all § 1983 claims," made no exception in *Wilson* for § 1983 actions that seek only equitable relief. Indeed, the Court was seeking to avoid the precise dispute we face here: The Court observed that if the statute depended on the particular facts or legal theory, "counsel could almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim." In the same vein, *Wilson* stressed that resolving the question of whether an action had been timely filed should be "an uncomplicated task for judges, lawyers, and litigants, rather than a source of uncertainty, and unproductive and ever-increasing litigation." *Wilson*'s strongly expressed interests in judicial economy suggest to us a finding of no exception for actions seeking equitable relief.

> [*Id.* at 412 (citations omitted)].

Other Circuit Courts of Appeal have come to the same conclusion, although they made their determinations before the Supreme Court's ruling in *Wilson*. These decisions rely on the fact that a statute of limitations will govern an equitable claim if a legal claim for damages could also have been brought. *See Swan v. Bd. of Higher Ed.*, 319 F.2d 56, 60 n.5 (2d Cir. 1963) (concluding in § 1983 case asking only for declaratory injunctive relief, "that since plaintiff could also have sought Civil Rights Act relief by way of damages, he is not here asserting a federal right for which the sole remedy is in equity, and hence the situation is one of 'concurrent' legal and equitable jurisdiction, in which case the statute of limitations does apply." (internal quotation marks and citation omitted)); *Williams v. Walsh*, 558 F.2d 667, 671 (2d Cir. 1977) (holding in § 1983 case that statute of limitations applied to both claim for damages and claim for injunctive relief); *Madison v. Wo*od, 410 F.2d 564, 567 (6th Cir. 1969) (holding in § 1983

30

case that plaintiff's "claim is outlawed [by the statute of limitations] even though he amended his complaint to seek purely equitable relief because 'equity will withhold its relief . . . where the applicable statute of limitations . . . bar(s) the concurrent legal remedy.'" (citation omitted)). Despite the paucity of case law on the issue, what law there is indicates that the two-year statute of limitations applies to Plaintiffs' claims, including their claims for prospective injunctive relief.

Plaintiffs, however, assert that the court orders to which they were subjected resulted in ongoing injuries, and so the orders constituted a continuing violation of their rights. "The continuing violations doctrine is an equitable exception to the timely filing requirement," which states that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks and citation omitted). However, "'[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation.'" *Id.* at 293 (quoting *Ocean Acres Ltd. v. Dare Cnty. Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983)).

In *Cowell*, the plaintiffs asserted that the imposition of municipal liens on their properties violated their due process rights under the Fourteenth Amendment. *Id.* at 291. The Third Circuit found that their claims were barred by the statute of limitations, holding that "[t]he mere existence of the liens does not amount to a continuing violation. Neither was the Township's refusal to remove the lien an affirmative act of a continuing violation." *Id.* at 293. Similarly, the Third Circuit has held that the enforcement of a custody order did not constitute a continuing violation. *Rose v. Cnty. of York*, 262 Fed. Appx. 485, 487 (3d Cir. 2008). In that case, the appellant asserted violations of his civil rights stemming from a custody dispute, including a claim that the order denying him custody "violated Appellant's procedural due process; and, thus,

31

violated Appellant's right to raise his child." *Id.* at 486. The appellant argued there was a continuing violation because "[t]he damages resulting from [the custody] order are still being enforced on the [Appellant]." *Id.* at 487. The Third Circuit concluded that "asserted continuing violations arise from the ill effects of the original alleged violation," and found the enforcement of the order was not a continuing violation *Id.*

As in *Rose* or *Cowell*, Plaintiffs' claims do not demonstrate continuing violations which would provide for an equitable exception to the statute of limitations. Each Plaintiff complains that on particular hearing dates, he was denied the right to a plenary hearing. Each Plaintiff also complains that custody orders which were filed denied that Plaintiff the right to parent his child or children. The allegedly unlawful acts at issue, therefore, are either the alleged absence of plenary hearings or the issuance of the orders that followed. The fact that Plaintiffs were unable to parent their children following the hearings or the orders "arise from the ill effects of the original alleged violation," but this continuing effect does not amount to a "continual unlawful act." *See Cowell*, 263 F.3d at 293. Thus, the two-year statute of limitations applies to Plaintiffs' claims

Plaintiffs' original complaint was filed on February 5, 2014; Plaintiffs claims must therefore have accrued on or after February 5, 2012. I will therefore examine each Plaintiff's claims to determine if he has asserted any act within that time period. It is not always clear whether the dates in the Amended Complaint represent motion dates, hearing dates, or order dates; for the purposes of determining whether the action falls within the statute of limitations, I will assume that any ambiguous date is the date of the hearing or order.

32

Appellants' Appendix page   A36

Plaintiff Edelglass[4] lost custody of his child in December of 1997; his requests for additional hearings in April 1998 and March 2006 were denied. Am. Compl. at ¶¶ 12, 15, 17. None of these dates fall within the statute of limitations, and therefore Plaintiff Edelglass's claims are dismissed.

A temporary restraining order was issued against Plaintiff Graf on January 9, 2012; the order was amended on February 10, 2012, and again on March 22; it was dismissed with prejudice in August of 2012. *Id.* at ¶¶ 20, 28, 33. Graf asserts that he "pursued costly motions and certifications" between the time the TRO was filed and its amendments. *Id.* at ¶¶ 28–29. Graf's claims rest on his assertion that the TRO was filed "on the basis of McComb's unchallenged (and in some cases prompted) allegations . . . on January 9th." *Id.* at ¶ 36. Graf does not assert that the motions which occurred following the TRO contained due process violations. Accordingly, Graf's claim is barred by the two-year statute of limitations.

Defendants concede that Plaintiff Joshi's claims are not time-barred. Def. Br. at 26 n.2.

On May 7, 2008, Plaintiff Litton asked the Ocean County Court to enforce his custody agreement; the Court instead suspended his visitation on May 8, 2008. *Id.* at ¶¶ 49, 52. The Order remained in effect until March 24, 2010. *Id.* at ¶¶ 54–55. Plaintiff Litton's claims are barred by the statute of limitations.

Plaintiff Malhan was stripped of custody on Feb. 24, 2011. *Id.* at ¶ 65. On April 1, 2011, there was an additional hearing, but not a plenary one, and Malhan was denied legal and physical custody. *Id.* at ¶ 68. In June 2012, the children's mother agreed to joint custody. Plaintiff Malhan's claims regarding his custody hearings are barred by the statute of limitations.

---

[4] Plaintiff Edelglass' claims have already been dismissed for lack of standing, *see supra*. However, his claims are also subject to the statute of limitations bar, and are mentioned for the sake of completeness.

However, Plaintiff Malhan further asserts in both Counts 1 and 2 that his rights were violated by the "gag order" issued on April 4, 2014. This order is within the statute of limitations, and this claim is therefore not time-barred.

Plaintiff Quinlan was stripped of legal custody, without a full hearing, on December 16, 2010. *Id*. at ¶ 81. Any claims regarding this hearing are time-barred. Quinlan also asserts that an "administrative error" led to an incorrect restraining order in a national database.[5] *Id.* at ¶ 86. However, Quinlan does not indicate the date this order was entered, or the dates of his demands that the error be fixed. Similarly, Quinlan does not indicate the date of the order that prevents him from possessing any weapons, which he claims was also issued in violation of due process. *Id.* at ¶ 91. As the Complaint on its face does not "show[] that the cause of action has not been brought within the statute of limitations," *Bethel*, 570 F.2d at 1174, these claims are not subject to dismissal on that basis.

Thus, Defendants' motion to dismiss on the basis of the statute of limitations is granted in part, as described above.

### H. Judicial and Qualified Immunity

In addition to the defenses raised above, Defendants assert that the Jurist Defendants are entitled to judicial immunity, and that all individual Defendants are entitled to qualified immunity. Def. Br. at 36, 40. However, at this point, the majority of the Plaintiffs' claims have been dismissed with prejudice; the few remaining claims—Plaintiff Joshi's claim regarding his custody hearings, Plaintiff Malhan's claims regarding the "gag order," and Plaintiff Quinlan's claims regarding the weapons order—have been dismissed for failure to plead how any of the

---

[1] In addition to the dismissal based on *respondeat superior*, this claim has been dismissed as barred by the Eleventh Amendment. *See supra.* I address the statute of limitations issue again for the sake of completeness.

actions of the individual Defendants caused these Plaintiffs harm. Finally, because all claims have been dismissed, an analysis of judicial immunity and qualified immunity is not necessary.

## IV. CONCLUSION

For the reasons expressed above, Defendants' motion to dismiss is granted. First, all claims against the State of New Jersey and all damages claims against the individual Defendants are dismissed as barred by the Eleventh Amendment. Additionally, all of the Plaintiffs' claims against the individual Defendants are dismissed, without prejudice, because they are based on a theory of *respondeat superior*, and therefore fail to state a claim under § 1983. Certain of the individual claims are also dismissed with prejudice: (1) all of Plaintiff Edelglass's claims are dismissed for lack of standing and as barred by the statute of limitations; (2) all of Plaintiff Graf's claims are dismissed as barred by the statute of limitations; (3) all of Plaintiff Litton's claims are dismissed as barred by the statute of limitations; (4) Plaintiff Malhan's claims regarding his custody hearings are dismissed as barred by the statute of limitations; and (5) Plaintiff Quinlan's claims regarding on his custody hearings are dismissed as barred by the statute of limitations.

Plaintiff Joshi's claim that he was denied full and equal custody of his children for over a year without due process is dismissed without prejudice. Similarly, Plaintiff Quinlan's claims based on the weapons order and Plaintiff Malhan's claims regarding the "gag order" are also dismissed without prejudice.[6]

An appropriate Order shall follow.

---

[6] The Court makes no comment on the viability of the foregoing claims surviving a Rule 12(b)(6) motion that addresses the substance of the claims or who may be named as defendants to such claims.

Date:   January 16, 2015                    _____/s/ Freda L. Wolfson_____

                                            Hon. Freda L. Wolfson, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

|  |  |
|---|---|
| ANTHONY ALLEN for himself and as parent of A.A., TODD BENNETT, for himself and as parent of E.B., SCOTT EDELGLASS, SHARIR FELDMAN, for himself and as Parent of A.F. and J.F, WERNER GRAF, for himself and as parent of A.G. and A.G., KARL HAGBERG, for himself and as parent of E.H, A.H. and C.H., CLIFTON HILL, for himself and as Parent of A.H, SAMIR JOSHI, for himself and as parent of J.J., J.J and J.J., YEHUDA B. LITTON, SURENDER MALHAN, for himself and as parent of E.M and V.M., CARLY OLIVIER for himself and as parent of M.O, ANTONIO QUINLAN for himself and as parent of K.Q., ZIA SHAIKH for himself and as parent of M.S., S.S., and H.S for themselves and on behalf of all others similarly situated, | Civil Action No. 14-0760 (FLW)(DEA) |
|  | **ORDER** |

Plaintiffs,

v.

LAWRENCE DE BELLO, TIMOTHY CHELL, KATHLEEN DE LANEY, JAMES DEMARZO, MADELIN EINBINDER, MARLENE LYNCH FORD, CHRISTOPHER GARENGER, LAWRENCE JONES, SEVERIANO LISBOA, ANTHONY MASSI, JOHN TOMASELLO, SHERRI SCHWEITZER, NANCY SIVILLI, and MAUREEN SOGLUIZZO,

Defendants.

_____

Civil Action No. 15-3519 (FLW)(LHG)

ANTHONY ALLEN for himself and as parent of A.A., TODD BENNETT, for himself and as parent of E.B., SHARIR FELDMAN, for himself and

As Parent of A.F. and J.F, KARL                    :
HAGBERG, for himself and as parent of      :
E.H, A.H. and C.H., CLIFTON HILL, for      :
himself and as parent of A.H, CARLY          :
OLIVIER for himself and as parent of M.O,  :
ZIA SHAIKH, for himself and as parent of    :
M.S., S.S., and H.S for themselves and on    :
behalf of all others similarly situated,         :
                                                                    :
                                    Plaintiffs,          :
                                                                    :
            v.                                                    :
                                                                    :
TIMOTHY CHELL, KATHLEEN              :
DELANEY, JAMES DEMARZO,                 :
MADELIN EINBINDER, LAWRENCE     :
JONES, SEVERIANO LISBOA,                  :
JOHN TOMASELLO, SHERRI                   :
SCHWEITZER, NANCY SIVILLI,            :
and MAUREEN SOGLUIZZO,                   :
                                                                    :
                                    Defendants.       :
_____        :

THIS MATTER having been opened to the Court by (1) Paul Alexander Clark, Esq., on

behalf of Plaintiffs Anthony Allen, Todd Bennett, Sharir Feldman, Werner Graf, Karl Hagberg,

Clifton Hill, Samir Joshi, Surender Malhan, Carly Olivier, Antonio Quinlan, and Zia Shaikh

(collectively "Plaintiffs"), on a motion for a preliminary injunction with respect to the claims of

Hagberg and Shaikh's custody hearings, it appearing that Defendants Lawrence De Bello, Timothy

Chell, Kathleen Delaney, James DeMarzo, Madelin Einbinder, Marlene Lynch Ford, Christopher

Garenger, Lawrence Jones, Severiano Lisboa, Anthony Massi, John Tomasello, Sherri Schweitzer,

Nancy Sivilli, and Maureen Sogluizzo (collectively "Defendants"), through their counsel, Akeel

Ahmad Qureshi, Esq., have opposed the motion and cross-moved to dismiss the Second Amended

Complaint in matter No. 14-0760 pursuant to Federal Rules of Civil Procedure 12(b)(6); and (2)

Defendants Chell, Delaney, DeMarzo, Einbinder, Jones, Lisboa, Massi, Tomasello, Schweitzer,

Sivilli, and Sogluizzo, through their counsel, Akeel Ahmad Qureshi, Esq., have moved to dismiss

the Complaint in matter No. 15-3519; it appearing that Plaintiffs have opposes the motion; the Court having considered the parties' written submissions in connection with the motions pursuant to Federal Rule of Civil Procedure 78, for the reasons set forth in the Opinion filed on even date, and for good cause shown,

**IT IS** on this 27th day of April, 2016,

**ORDERED** Defendants' cross-motion to dismiss the Second Amended Complaint in No. 14-0760 [Dkt. No. 35] is GRANTED, all of the claims in that matter are dismissed with prejudice, and that matter is marked closed; and

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss the Complaint in No. 15-3519 [Dkt. No. 8], is GRANTED in part and DENIED in part as follows:  all claims in No. 15-3519 are dismissed with prejudice except for Plaintiff Hagberg's challenge, as an employee of a media outlet, to the gag order entered by Judge Sivilli against Plaintiff Malhan; and

**IT IS FURTHER ORDERED** that Plaintiff Hagberg is directed to inform this Court within 10 days as to whether the gag order entered by Judge Sivilli against Plaintiff Malhan remains in effect, or has modified or vacated; and

**IT IS FURTHER ORDERED** that Plaintiffs' motion for a preliminary injunction [No. 14-0760; Dkt No. 34] is denied as moot.

/s/ Freda L. Wolfson

The Honorable Freda L. Wolfson

United States District Judge

**\*\*NOT FOR PUBLICATION\*\***

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ : | Civil Action No. 14-0760 (FLW)(DEA) |
| ANTHONY ALLEN for himself and as : | |
| parent of A.A., TODD BENNETT, for : | **OPINION** |
| himself and as parent of E.B., SCOTT : | |
| EDELGLASS, SHARIR FELDMAN, for : | |
| himself and as Parent of A.F. and J.F, : | |
| WERNER GRAF, for himself and as parent : | |
| of A.G. and A.G., KARL HAGBERG, for : | |
| himself and as parent of E.H, A.H. and : | |
| C.H., CLIFTON HILL, for himself and as : | |
| Parent of A.H, SAMIR JOSHI, for himself : | |
| and as parent of J.J., J.J and J.J., YEHUDA : | |
| B. LITTON, SURENDER MALHAN, for : | |
| himself and as parent of E.M and V.M., : | |
| CARLY OLIVIER for himself and as : | |
| parent of M.O, ANTONIO QUINLAN for : | |
| himself and as parent of K.Q., ZIA : | |
| SHAIKH for himself and as parent of M.S., : | |
| S.S., and H.S for themselves and on : | |
| behalf of all others similarly situated, : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| LAWRENCE DE BELLO, TIMOTHY : | |
| CHELL, KATHLEEN DE LANEY, : | |
| JAMES DEMARZO, MADELIN : | |
| EINBINDER, MARLENE LYNCH FORD, : | |
| CHRISTOPHER GARENGER, : | |
| LAWRENCE JONES, SEVERIANO : | |
| LISBOA, ANTHONY MASSI, JOHN : | |
| TOMASELLO, SHERRI SCHWEITZER, : | |
| NANCY SIVILLI, and MAUREEN : | |
| SOGLUIZZO, : | |
| : | |
| Defendants. : | |
| _____ : | |
| : | Civil Action No. 15-3519 (FLW)(LHG) |
| ANTHONY ALLEN for himself and as : | |
| parent of A.A., TODD BENNETT, for : | |

himself and as parent of E.B.,                    :
SHARIR FELDMAN, for himself and      :
As Parent of A.F. and J.F, KARL          :
HAGBERG, for himself and as parent of  :
E.H, A.H. and C.H., CLIFTON HILL, for  :
himself and as parent of A.H, CARLY     :
OLIVIER for himself and as parent of M.O, :
ZIA SHAIKH for himself and as parent of  :
M.S., S.S., and H.S for themselves and on :
behalf of all others similarly situated,      :
                                                               :
                                       Plaintiffs,     :
                                                               :
           v.                                              :
                                                               :
TIMOTHY CHELL, KATHLEEN          :
DELANEY, JAMES DEMARZO,            :
MADELIN EINBINDER, LAWRENCE    :
JONES, SEVERIANO LISBOA,            :
JOHN TOMASELLO, SHERRI            :
SCHWEITZER, NANCY SIVILLI,        :
and MAUREEN SOGLUIZZO,            :
                                                               :
                                     Defendants.    :
_____ :

**<u>WOLFSON, United States District Judge</u>:**

These matters come before the Court on three motions in two separately filed actions, in which Plaintiffs have sued the individual state court judges who have (and may continue) to preside over Plaintiffs' child custody disputes.  First, in No. 14-0760, Plaintiffs Anthony Allen, Todd Bennett, Sharir Feldman, Werner Graf, Karl Hagberg, Clifton Hill, Samir Joshi, Surender Malhan, Carly Olivier, Antonio Quinlan, and Zia Shaikh (collectively "Plaintiffs") have filed a motion for a preliminary injunction with respect only to Plaintiffs Hagberg and Shaikh's child custody determinations, but have not moved for similar preliminary relief for the other Plaintiffs, or sought such relief on behalf of Hagberg and Shaikh in No. 15-3519, a substantially identical matter to which they are also parties.  Second, Defendant Judges Lawrence De Bello, Timothy Chell, Kathleen Delaney, James DeMarzo, Madelin Einbinder, Marlene Lynch Ford, Christopher

Garenger, Lawrence Jones, Severiano Lisboa, Anthony Massi, John Tomasello, Sherri Schweitzer, Nancy Sivilli, and Maureen Sogluizzo (collectively "Defendant Judges") have cross-moved for dismissal of the Amended Complaint filed in No. 14-0760, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Third, Defendant Judges Chell, Delaney, DeMarzo, Einbinder, Jones, Lisboa, Massi, Tomasello, Schweitzer, Sivilli, and Sogluizzo have moved for dismissal of the Complaint filed in No. 15-3519, pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  For the following reasons, Defendant Judges' motion to dismiss in No. 14-0760 is granted and their motion to dismiss in No. 15-3519 is granted in part and denied in part.  Plaintiffs' motion for a preliminary injunction in No. 14-0760 is denied as moot.

Plaintiffs seek to have this Court dramatically change the legal landscape of New Jersey and the laws governing child custody proceedings between parents.  In suing the Defendant Judges who have presided over their child custody cases, Plaintiffs interpret the United States Constitution as requiring that when parents divorce or separate, each parent has a fundamental right to automatically receive 50-50 custody of his or her children, and that courts are limited to ordering a different custody arrangement only upon a finding, by clear and convincing evidence, in a plenary hearing (and with a right to counsel for both parents), that one of the parents abuses or neglects the child or is otherwise an unfit parent.  Without commenting on the merits of Plaintiffs' suggested interpretation of the Constitution, this Court finds that Defendant Judges are not the proper defendants for Plaintiffs' request for declaratory relief because they were all acting as neutral arbiters in the underlying custody disputes, and Plaintiffs' request for injunctive relief must fail because Plaintiffs have an adequate remedy at law.

---

[1] Judges De Bello, Ford, Garenger, and Massi are not defendants in No. 15-3519.

Accordingly, Plaintiffs' claims concerning their custody hearings are dismissed with prejudice.  For the same reasons, Plaintiff Malhan's claim concerning his gag order and Plaintiff Quinlan's claim concerning his weapons order are dismissed with prejudice.  The only claim that remains is Plaintiff Hagberg's challenge in No. 15-3519, as an employee of a media outlet, to the gag order entered by Judge Sivilli in Malhan's underlying custody matter, which the parties have not adequately addressed on the motions before the Court.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs in these matters have engaged in a number of questionable litigation tactics which have resulted in a very confused record.  Accordingly, this Court must clarify several issues before it begin its recitation of the facts still at issue in the pending matters.

On February 5, 2014, Plaintiffs Edelglass, Joshi, Litton, Malhan, and Quinlan originally filed suit against the State of New Jersey and four individual defendants:  Michelle M. Smith, Esq., the clerk of the Superior Court of New Jersey, and Judges John  L. Call, Jr., Maureen Sogluizzo, and Patricia B. Roe, who were all sued "in their capacity as administrators tasked with enforcing policies which deny plaintiffs['] constitutional rights under color of law[.]"  Compl. ¶ 9.  Plaintiffs filed an Amended Complaint on April 14, 2014, which added Graf as a plaintiff and Judges Thornton and Fitzpatrick as defendants and asserted plaintiffs' claims both individually and on behalf of a putative class

On June 14, 2014, Judges Call, Sogluizzo, Roe, Thornton, and Fitzpatrick, along with the State of New Jersey and Smith, filed a motion to dismiss the Amended Complaint.  On January 16, 2015, this Court issued a decision dismissing all of the claims in No. 14-0760.  Specifically, the Court determined that (1) Eleventh Amendment immunity barred the plaintiffs' claims against

4

the State of New Jersey[2] and against individual defendants, sued in their official capacities, to the extent plaintiffs sought monetary damages; (2) that the all claims asserted by Plaintiffs Edelglass, Graf, and Litton, were barred by the statute of limitations, along with Plaintiffs Malhan and Quinlan's claims concerning their custody hearings (but not their respective claims regarding the gag and weapons orders); (3) and that all the plaintiffs' claims against individual defendants, including those of Plaintiffs Joshi, Malhan, and Quinlan, were dismissed without prejudice because they were based on the theory of *respondeat superior* and, therefore, failed to state a claim under 42 U.S.C. § 1983.

Following that dismissal, Plaintiffs filed a Second Amended Complaint which drastically changed the make-up of the parties. The original six plaintiffs (Edelglass, Graf, Joshi, Litton, Malhan, and Quinlan), were expanded to thirteen (Allen, Bennett, Edelglass, Feldman, Graf, Hagberg, Hill, Joshi, Litton, Malhan, Olivier, Quinlan, and Shaikh).

Moreover, while the Court dismissed the claims asserted by Edelglass, Graf, and Litton with prejudice, they nevertheless reasserted their claims in the Second Amended Complaint, and only Plaintiff Graf has plead additional new allegations that occurred within the applicable limitations period. *See* Sec. Am. Compl. ¶¶ 91-92, 94, 102-03. Thus, although Plaintiffs have continued to include allegations concerning Edelglass and Litton in the Second Amended Complaint, *id.* at ¶¶ 60-67, 80-103, 166-177, and, indeed, appear to have even expanded these allegations in ways that do nothing to cure the statute of limitations bar, *see id.* at ¶¶ 62-64, 66-67,

---

[2] In addition, Plaintiff Quinlan's claim for injunctive relief against the State of New Jersey, seeking the correction of his being listed in a database showing a restraining order was entered against him, was also dismissed as barred by the Eleventh Amendment.

5

80, 87, 168, 176-77, the claims of Edelgass and Litton in No. 14-0760,[3] are dismissed with prejudice.

Similarly, this Court dismissed with prejudice Plaintiff Malhan and Quinlan's claims concerning their custody hearings based on their failure to file suit within the relevant two-year statute of limitations, but not their claims concerning Malhan's gag order and Quinlan's weapons order.  The Second Amended Complaint includes new allegations concerning Malhan and Quinlan's custody hearings, which also do nothing to cure the statute of limitations bar.  *See* Sec. Am. Compl. ¶¶ 183-86, 189-92, 228.  These claims are dismissed with prejudice.

Moreover, on February 23, 2016, this Court entered an Order – at Plaintiffs' request – dismissing with prejudice any and all claims and allegations brought on behalf of putative class members.[4]

The Second Amended Complaint also completely revamped the roster of defendants in No. 14-0760.  The Amended Complaint originally named the State of New Jersey and six individual defendants: Smith and Judges John. L. Call, Jr.; Maureen Sogluizzo; Catherine Fitzpatrick; Lisa Thornton; and Patricia B. Roe, who were all sued "in their capacity as administrators tasked with enforcing policies which deny plaintiffs['] constitutional rights under color of law[.]"  Am. Compl. ¶ 9.  Following this Court's decision in January, the Second Amended Complaint added an entirely new list of fourteen defendants (with the exception of Judge Sogluizzo, who is now only sued

---

[3] Edelgass, Graf, and Litton are not named as parties in no. 15-3519, but their allegations are repeated in the Complaint in that matter under the heading "Additional Histories Showing Systematic Deprivation of Parental Rights."

[4] The Court notes that although some of Plaintiffs' claims share some of (but not all) the same common questions of law, it is questionable whether it is appropriate for all Plaintiffs to have joined in one, unwieldly action, because as demonstrated by the substantial factual recitation which follows, each Plaintiff's individual claims stand on their own specific facts.

because she allegedly presided over one custody matter):  Judges Lawrence De Bello, Timothy

Chell, Kathleen Delaney, James DeMarzo, Madelin Einbinder, Marlene Lynch Ford, Christopher

Garenger, Lawrence Jones, Severiano Lisboa, Anthony Massi, John Tomasello, Sherri Schweitzer,

Nancy Sivilli, and Maureen Sogluizzo, who are now sued "in their official and individual

capacities" because, allegedly, "by their actions and policies they denied plaintiffs constitutional

rights under color of law."  Sec. Am. Compl. ¶ 16.  However, the only allegations asserted against

Judge De Bello in the Second Amended Complaint concern the custody order he entered with

respect to Graf's children on January 9, 2012.  *Id.* at ¶¶ 86-87, 97, 100, 102-03.  This claim was

previously dismissed, with prejudice, as barred by the statute of limitations and should not have

been re-plead here.  The claims against Judge De Bello are dismissed with prejudice.

Following this Court's decision in January, but before filing the Second Amended

Complaint on August 7, 2015, Plaintiffs Allen, Bennett, Feldman, Hagberg, Hill, Olivier, and

Shaikh filed a separate action, No. 15-3519, on May 22, 2015.  On December 10, 2015, this Court

ordered both matters consolidated for motion purposes.  A side-by-side review of the relevant

pleadings in these two matters reveals that, with the exception of three paragraphs concerning

Judge Sivilli's "gag order" issued against Plaintiff Malhan, No. 15-3519 Compl. ¶¶ 12, 16, 83,

which Plaintiffs inexplicably omitted from the Second Amended Complaint in No. 14-0760, the

only differences between the two relevant pleadings are (1) the addition of new parties in the latest

complaint filed in No. 14-0760; (2) the re-packaging of allegations concerning Plaintiff Malhan's

gag order with respect to Plaintiff Hagberg, *id.* at ¶¶ 79-83; and (3) inconsequential typographical

errors and stylistic changes, *see, e.g.*, *id.* at ¶¶ 11, 79, 108.  Accordingly, in the interest of

efficiency, this Court will refer primarily to the Second Amended Complaint to set forth the facts underlying this decision.[5]

In summary, these matters now only concern (1) the custody hearings of nine individual plaintiffs (Allen, Bennett, Feldman, Graf, Hagberg, Hill, Joshi, Olivier, and Shaikh); (2) Malhan's challenge to his gag order; (3) Quinlan's challenge to his weapons order; and (4) Hagberg's challenge to Malhan's gag order, and (5) thirteen judicial defendants (Judges Chell, Delaney, DeMarzo, Einbinder, Ford, Garenger, Jones, Lisboa, Massi, Tomasello, Schweitzer, Sivilli, and Sogluizzo).  Having set forth the procedural status of the matters at hand, the Court turns to the facts underlying each individual plaintiff's claims.

### A.    Custody Claims

#### i.    Anthony Allen

Anthony Allen is the father of a minor, A.A., who was born in 1998.  Sec. Am. Compl. ¶¶ 3, 20.  On September 26, 2003, Allen alleges that he was stripped of custody in a "summary, *ex parte* proceeding" by Judge Raymond Hayser, who issued an order granting custody of A.A. to his mother, Terri Hand.  *Id.* at ¶¶ 21-22.  Allen alleges that "[o]ver the next decade" he has repeatedly and unsuccessfully sought custody and/or parenting time with A.A.  *Id.* at ¶¶ 23-24.  Allen alleges that in March of 2009, he sought "joint residential custody" of A.A., and that a different judge, Judge Blackburn, issued an order on March 17, 2009, which limited Allen's parenting time to

---

[5] The Court notes that while these motions were pending, Plaintiffs Hagberg and Shaikh filed yet another complaint, this time against only Judge Ford, under docket no. 16-1189.  While the claims in No. 16-1189 may ultimately be decided in the same manner as Plaintiffs' claims today, that matter has not been consolidated with the cases currently before me on motion, and Hagberg and Shaikh have not yet responded to the motion to dismiss filed in that matter; therefore, it would be inappropriate for this Court to rule on the claims at issue in No. 16-1189 at this time. However, these Plaintiffs would be well-advised to tailor their opposition to the Court's rulings on these motions.

"supervised visitation." *Id.* at ¶¶ 24-25. However, Allen alleges that although this order may have been intended to help Allen, it actually represents a "significant restriction on Allen's parental rights as his visitation went from unsupervised to supervised," and that Judge Blackburn did not hold Hand "accountable for her failure to cooperate with earlier court orders." *Id.* at ¶¶ 26-27.

Allen alleges that on December 16, 2010, Judge Massi entered an Order that Allen would have parenting time limited to every other weekend, from Friday after school to Sunday afternoon. *Id.* at ¶ 29. On June 16, 2014, Judge Tomasello ordered that Hand should arrange for counseling "to establish reunification between the Defendant [Allen] and the parties['] daughter." *Id.* at ¶ 30. On January 21, 2015, Judge Tomasello issued a written Order appointing a third party, identified as "Mrs. Kearney," to supervise parenting time and ordered "Mrs. Kearney to pick the dates for parenting time to take place." *Id.* at ¶ 31.

On February 5, 2015, after Hand allegedly failed to bring A.A. to a scheduled visit on February 4th, Allen filed an Order to Show Cause in state court demanding "50% custody + 50% parenting time to start immediately," which was heard by Judge Call, who scheduled a return date for Tuesday February 10, 2015. *Id.* at ¶ 34. On the return date for the motion, Allen alleges that no plenary hearing occurred, but Hand appeared *pro se* and stated that she had been unable to allow parenting time on February 4th due to an unspecified "private" medical problem and that, on another occasion, she had needed to cancel a parenting time session due to weather. *Id.* at ¶ 35. Allen alleges that although Judge Call was critical of Hand's "constant excuses," Judge Call entered an order, despite Allen's objection that he was entitled to 50% custody, that further "reduced Allen's parenting time" without "making any finding that Allen was unable or unfit to parent A.A." *Id.* at ¶¶ 36-40. On March 24, 2015, Allen again appeared in court, this time before Judge Tomasello, to demand 50/50 parenting time. *Id.* at ¶ 41. However, on that date, Allen

9

alleges that Judge Tomasello signed an Order which further reduced Allan's parenting time with his daughter. *Id.* at ¶ 42.

Allen alleges that he has never received a plenary hearing, even though "there does not appear to be any issue as to whether Allan is a fit parent." *Id.* at ¶ 42. Allen does not specifically challenge the Orders of Judge Hayser, Blackburn, Call, or Massi (despite being a named defendant elsewhere in this matter). Instead, Allen alleges:

> The 2014 and 2015 Orders of Judge Tomasello substantially restricted the legal rights of Allen to the care, custody and control of his children based on no particular findings of fact, but based on a vague concern that A.A. and Allen must be reunified "slowly." These Orders of Judge Tomasello deprived Allen of the care, custody and control of his children with out due process. For years, Allen has sought 50% custody of his daughter, but for years, Judge Tomasello and other family court judges have severely restricted his legal rights without justification and without any apparent standard being applied. These severe restrictions on Allen's custody rights has damaged, and continues to damage the father-daughter relationship between Allen and A.A.

*Id.* at ¶¶ 43-45.

### ii.    Todd Bennett

Todd Bennett is the father of the minor E.B., who was born in 2009. *Id.* at ¶¶ 4, 46. On October 2, 2013, E.B.'s mother, Valerie Galdieri, filed a non-dissolution complaint in the Superior Court, Family Part, Morris County seeking joint legal custody of, and parenting time with, E.B. *Id.* at ¶¶ 46, 48. On May 8, 2014, an unidentified judge entered an order that provided that Bennett and Galdieri would share joint physical custody. *Id.* at ¶ 50.

On August 25, 2014, Galdieri filed an application for an Order to Show Cause demanding that Bennett's parenting time with E.B. be suspended indefinitely, based on her assertion that Bennett had kept the child longer than their unofficial agreement had allowed. *Id.* at ¶¶ 52-53. Bennett alleges that on August 27, 2014, Judge DeMarzo "had the parties and their counsel appear for oral argument. No cross examination of Ms. Galdieri was allowed and no plenary hearing was

conducted." *Id.* at ¶ 54. On that same date, Judge DeMarzo signed an order "which ordered Bennett to immediately relinquish physical custody of E.B. to Galdieri, and also limited Bennett's parenting time to every other weekend, plus six hours during the week," without making any "findings of fact or conclusions of law" or conducting a hearing. *Id.* at ¶¶ 55-56. Specifically, Bennett alleges that Judge DeMarzo "did not find that Bennett was an unfit parent, nor did Judge DeMarzo find any abuse or neglect—which a full investigation [by the New Jersey Division of Child Protection and Permanency] three months earlier had not found either." *Id.* at ¶¶ 57, 49. Further, Bennett alleges that "Judge DeMarzo did not appear to apply any legal standard at all," *id.* at 58, but rather "arbitrarily, capriciously and without due process, substantially obstructed Bennett's right to the care, custody and control of E.B, causing severe anguish and suffering on the part of father and child." *Id.* at ¶ 59.

### iii.    Sharir Feldman

Sharir Feldman is the father of minor children A.F. (born 1999) and J.F (born 2002). *Id.* at ¶¶ 5, 68. Feldman alleges that "[a]s . . . early [as] October 2013, Feldman had joint legal custody and residential custody of his son J.F., while . . . Feldman's ex-wife, Cristina Langley[,] had residential custody of the daughter A.F." *Id.* at ¶ 69.

On October 24, 2013, Langley filed an Order to Show Cause in the Hudson County Family Court, demanding physical custody of J.F. as well as demanding that Feldman begin paying Langley child support, which Judge Sogluizzo granted; all of Feldman's parenting time with J.F. was immediately suspended until further notice based on "allegations still being investigated." *Id.* at ¶¶ 70-71. Feldman alleges that the October 24 Order not only suspended all parenting time, but also denied telephonic contact between Feldman and J.F., and only allowed text messaging. *Id.* at ¶ 72.

Feldman alleges that no plenary hearing was held, and "Feldman was not permitted to present any evidence and was not represented by counsel." *Id.* at ¶ 71. Judge Sogluizzo set a date of December 12, 2013 for "further proceedings," *id.* at 72, but that, "December 12 came and went but there was no change in custody. *Id.* at ¶ 73. On March 10, 2014 Judge Sogluizzo conducted a "hearing review," and, in an Order dated March 10, 2014, Judge Sogluizzo permitted some parenting time to Feldman, but still continued to severely limit Feldman's parental rights "without any apparent reason." *Id.* at ¶¶ 75-76.

### iv.   Werner Graf

Werner Graf is the father of minor children A.G. (born in 2004) and A.G. (born in 2008). *Id.* at ¶¶ 6, 80. On January 9, 2012, Graf's wife, Lisa McComb, filed for an *ex parte* domestic violence temporary restraining order ("TRO"). *Id.* at ¶¶ 80-81. On that same date, Judge De Bello signed the TRO, "without making any findings as to any harm to the children and without a plenary hearing"; he granted temporary custody of both children to McComb, and further ordered that Graf would have "[n]o parenting time/visitation until further ordered." *Id.* at ¶¶ 86-87. Graf alleges that although he was notified of the TRO on January 9, it required him to find alternative living arrangements which, in addition to his work obligations, left Graf with no time to prepare or obtain counsel for the hearing on the permanent, final restraining order, which was originally scheduled for January 11, 2012. *Id.* at ¶ 88.

"Although Graf wanted to resolve the issue on the 11th, the Court correctly cited the lack of time to prepare and opposing counsel agreed that additional time should be granted." *Id.* at ¶ 90. During the interim time period, Graf was ordered not to have any contact whatsoever (including indirect communications as well as phone or email) with his two daughters, and grandparents and friends of Graf were restricted from all contact. *Id.* at ¶ 89.

12

On February 10, 2012, Judge Massi issued a Consent Order, "without a plenary hearing and without making any finding with respect to the children "turned a 'temporary' denial of parental rights[] into an indefinite denial of parental rights," by permitting ten hours of Supervised parenting time for Graf on February 12, but otherwise ordering that all other terms of the January 9th Order remained in effect, including denial of any "parenting time/visitation" with Graf's children. *Id.* at ¶¶ 91-92. Graf alleges that he consented to this Order in order to see his children, whom he had not seen in a month. *Id.* at ¶ 92.

On March 22, 2012, after "repetitive appeals" to Judge Massi, Graf alleges he was permitted to have custody/parenting time every other weekend, subject to the availability of supervisors approved by the Court. *Id.* at ¶ 94. Graf also alleges that he was "permitted periodic phone contact and only supervised visitation the weekends of March 30, April 13, and April 27, 2012," and that on April 23, 2012, Judge Massi signed an Order Amending Temporary Restraints which permitted telephonic or Skype contact between Graf and his daughters twice a week, but otherwise continued severe restrictions on his parenting time and requiring all visitation to be supervised. *Id.* at ¶¶ 95-96.

Graf alleges that he refused to settle with McComb and that the TRO was dismissed with prejudice in August 2012. *Id.* at ¶¶ 98-99. In September 2012, Graf alleges a "50-50 custody agreement [was] finally struck." *Id.* at ¶ 100.

### v.     Karl Hagberg

Karl Hagberg is the father of minor children, E.H, (born 2003), A.H. (born 2005) and C.H. (born 2008). *Id.* at ¶¶ 7, 104. He is employed by Currents Magazine. *Id.* at ¶¶ 7, 105. In June 2014, Anna Hagberg ("Anna"), Hagberg's estranged wife, accused Hagberg of hitting one of his children. *Id.* at ¶¶ 104, 06. Anna subsequently filed an Order to Show Cause demanding that

13

Hagberg's custody be terminated. *Id.* at ¶ 107.  On August 14, 2014, Judge Jones entered an order, without conducting a plenary hearing, which denied Anna's motion to be granted full legal and residential custody, but also "significantly reduced the parenting time/physical custody permitted to Mr. Hagberg." *Id.* at ¶¶ 107-08.  Hagberg alleges that "the Court apparently concluded that even if the allegation that Hagberg had hit one of his children were true it would not justify a total loss of custody, however, the Court apparently concluded that a substantial reduction in parenting time was justified by the unsubstantiated allegation." *Id.* at ¶ 108; *see also id.* at ¶ 112 ("Hagberg has never had a plenary hearing, and the court has not been presented with any actual evidence of abuse or neglect. Judge Jones appears to be denying Hagberg significant time with his children based on generalize[d] and unsubstantiated concerns about his parenting.").  On September 17, 2014, Judge Jones signed an Order expanding Hagberg's parenting time, but did not order equal parenting time. *Id.* at ¶ 110.

Hagberg also alleges that, on August 5, 2015, Judge Ford conducted an *ex parte* proceeding, pursuant to an Order to Show Cause, and entered an order stating:  "Defendant father's parenting time with the three (3) children minor children shall be suspended until further Order of the Court." *Id.* at ¶ 113.  Hagberg asserts that no plenary hearing was held, Hagberg was not afforded an opportunity to respond, and the August 5 order was entered "without any finding of abuse or neglect by H[a]gberg." *Id.* at ¶ 114.  Hagberg also asserts that, although Judge Ford scheduled "further argument" on August 21, 2015, she did not hold an evidentiary hearing. *Id.* at ¶ 115.

### vi.  Clifton Hill

Clifton Hill is the father of the minor child A.H., who was born in 2010. *Id.* at ¶¶ 8, 119.  In 2013, Hill and his estranged wife, Jennifer Russel, formally filed for divorce. *Id.* at ¶¶ 119-20.

In June 2013, Hill petitioned the court to allow him unsupervised parenting time with A.H. while the divorce litigation was pending. *Id.* at ¶ 121. In an Order dated June 14, 2013, Judge Delaney denied Hill's request without conducting a plenary hearing. *Id.* at ¶ 122.

In September 2013, Hill filed a motion to enforce litigants rights demanding that Russell be sanctioned for refusing to participate in reunification therapy -- the only contact allowed by Judge Delaney's June 14th Order -- and also demanding that the court allow him physical custody of A.H. *Id.* at ¶¶ 123-25. On October 18, 2013, Judge Delaney denied Hill's request for custody and for sanctions against Russell, but granted the motion to enforce litigants' rights and ordered that Russell comply with the prior order for reunification therapy. *Id.* at ¶¶ 126-27. Hill alleges, again, that no plenary hearing was held. *Id.* at ¶ 128.

Hill alleges that, due to false criminal allegations Russell made against him "[d]uring this time," he lost his job and has incurred several financial difficulties. *Id.* at ¶¶ 129-31. As a result of "[b]eing unemployed and faced with borrowing money to make child support payment[s] he could not afford, Hill was unable to afford an attorney to assist him, and he was appearing *pro se.*" *Id.* at ¶ 132.

In April 2014, Hill alleges Judge Schweitzer suspended the "reunification therapy" visits as a result of an application for a TRO filed by Russell. *Id.* at ¶ 133. Although the TRO was dismissed, Hill alleges that Russell continued to refuse to participate in "reunification therapy" and that Russell applied to have the therapy terminated. *Id.* at ¶ 134.

On October 23, 2014, without conducting a plenary hearing, Judge Schweitzer entered an Order which terminated all parenting time between Hill and A.H. indefinitely until Hill "complete[d] parenting classes with a licensed psychologist" and submitted the psychologist's report to the Court. *Id.* at ¶¶ 136-38.

15

In early 2015, Hill alleges that he filed a motion with the court to allow him parenting time, and requested a plenary hearing. *Id.* at ¶ 140. On March 5, 2015, Judge Chell entered and order and statement of reasons denying Hill's motion, holding (1) that Hill could not see A.H. until he demonstrated "changed circumstances" by completing the parenting classes with a licensed psychologist, (2) that Hill had not demonstrated that a change in custody was in the best interests of the child, and (3) limited Hill's contact with A.H. to one phone call per week. *Id.* at ¶¶ 141-43. Hill alleges that "Judge Chell made no findings that Hill was an unfit parent, and no plenary hearing has ever been conducted." *Id.* at ¶ 144.

Hill alleges that the orders of Judges Delany, Chell, and Schweitzer "have severely restricted his fundamental, constitutional rights without justification and without any apparent standard being applied in violation of the Fourteenth Amendment." *Id.* at ¶¶ 147-50.

### vii. Samir Joshi

Samir Joshi is the father of two minor children J.J. and J.J. *Id.* at ¶¶ 10, 151. Joshi and his former wife, Christine Joshi, were married and then divorced in Pennsylvania, but on June 22, 2012, Christine filed an Order to Show Cause in New Jersey Superior Court, Burlington County seeking to have New Jersey "take jurisdiction." *Id.* at ¶¶ 151-52. Joshi alleges that he was not properly served with the Order to Show Cause and did not appear for this proceeding. *Id.* at ¶ 152. Joshi alleges that his ex-wife gave testimony at the hearing "based largely on hearsay evidence," after which "Judge Janet Smith signed an Order directing that Joshi hand over physical custody of the children to Christine immediately and Ordered he was not to take the children outside of New Jersey," Judge Smith set a return date on the Order to Show Cause for July 12, 2012. *Id.* at ¶¶ 153-54.

16

Joshi alleges that he did not receive notice of the July 12 proceeding "until a few days before the hearing." *Id.* at ¶ 155. He further alleges that he requested a continuance from the court due to the recent death of his father, but the request was denied. *Id.* at ¶¶ 155-56. At the July 12 proceeding, Joshi claims that he was not allowed to cross-examine his ex-wife and that, due to the short notice and the death in his family, he "did not have time to prepare evidence to submit, nor obtain counsel." *Id.* at ¶ 157.

On July 12, 2012, Judge Smith entered an order which required Joshi to hand over physical custody of the children and "suspended parenting time until [Joshi] provides assurance that he will return the parties' children, and the Court issues another order." *Id.* at ¶ 158.

Joshi requested that the July 12 Order be "revised to give him full and equal custody, or in the alternative, at least parenting time each weekend." *Id.* at ¶ 159. In an Order dated December 4, 2012, Judge Garenger denied Joshi's requests, without a plenary hearing, and "slightly modified the earlier Order but only permitted 'supervised visitation through the Burlington County Supervised Visitation Program.'" *Id.* at ¶¶ 160-61.

In the summer of 2013, Joshi again demanded full and equal custody, and requested a full plenary hearing. *Id.* at ¶ 162. In an Order dated July 26, 2013, Judge Garenger denied Joshi's request for a plenary hearing and granted limited parenting time to Joshi. *Id.* at ¶ 162.

### viii.    Carly Olivier

Carly Olivier is the father of the minor child M.O., who was born in 2006. *Id.* at ¶¶ 12, 203. Olivier alleges that in January of 2014, Lisa Jenkins, M.O.'s mother, "filed an Order to show cause accusing Olivier of physically abusing their daughter." *Id.* at ¶¶ 203-04. On February 21, 2014, Judge Lisboa signed an Order, without conducting a plenary hearing, that limited Olivier's parenting time with his daughter to one supervised visitation per week, supervised at the Hudson

County Courthouse, and required Olivier and Jenkins to "comply with all DYFS recommendations." *Id.* at ¶¶ 205-09. Olivier was not represented by counsel at the hearing, which he alleges he "could not afford." *Id.* at ¶ 208.

On August 7, 2014 Olivier appeared in court for Judge Lisboa to "review the case," where he acknowledged he was not complying with the DYFS recommendations because he did not believe they were correct. *Id.* at ¶¶ 213-14. Olivier alleges that Judge Lisboa told him "You're going to have to dig in your own pocket and hire your own doctor to present to this court that Dr. Figerelli [the DYFS expert] has made a mistake," and that Olivier stated he could not afford to hire his own expert. *Id.* at ¶ 215. Olivier also alleges that a representative from DCP&P was on the phone, and indicated that there were no abuse and neglect concerns, but Olivier was not permitted to cross examine this person. *Id.* at ¶ 216. Olivier alleges that, "[d]espite there not being any issues of abuse or neglect Judge Lisboa . . . told Olivier on the record, 'You are not going to see the child until you comply with all these other things.'" *Id.* at ¶ 218. Olivier alleges that Judge Lisboa entered an Order which stated: "The visitation is suspended until further order of the court and DCP&P will close their case." *Id.* at ¶ 219. Olivier alleges he then contacted DCP&P to participate in the "recommended" programs, but that he could not do so because "DCP&P had closed the case they no longer could provide any services to Olivier." *Id.* at ¶ 220.

Olivier alleges that "[d]espite the acknowledgment that there was "no child abuse or neglect" and without a plenary hearing, and without benefit of counsel, or the ability to present evidence, Olivier's parenting time has been terminated by Judge Lisboa" and that "Olivier's right to the care and custody of his daughter has been terminated permanently due to his inability to afford, and the State's refusal to provide, 'recommended' programs." *Id.* at ¶¶ 223-24.

### ix.    Zia Shaikh

18

Zia Shaikh is the father of the minor children M.S. (born 2000), S.S. (born 2003, and H.S. (born 2007). *Id.* at ¶¶ 14, 239. In October 2013, Mr. Shaikh filed for divorce from his wife Laura Germandig-Shaikh ("Germandig"). *Id.* at ¶ 240. On January 18, 2014, Germandig filed for a TRO against Shaikh, which was dismissed after a hearing on January 31, 2014. *Id.* at ¶ 241. Although Shaikh alleges that the court ruled "that nothing in the testimony of Germandig alleged domestic violence or alleged anything more than an argument typical of a failing marriage[,] [n]evertheless, as a result of the TRO Shaikh was made to vacate his house." *Id.* at ¶ 241.

On April 2, 2014, Shaikh alleges that Germandig "filed a motion in the family court requesting that Shaikh again be evicted and excluded from the family residence and demanding full custody of the children," with a return date of May 2, 2014. *Id.* at ¶ 242. On April 23, 2014, Judge Einbinder held a case management conference, which Shaikh alleges he was not notified of, and "for reasons which remain unclear, Shaikh's counsel did not attend." *Id.* at ¶ 243. Shaikh further alleges that "[t]he Court attempted to call Shaikh's counsel that morning but she could not be reached, and the voice mailbox was full." *Id.* at ¶ 244. Shaikh alleges that at this conference, Germandig's counsel made an oral request for an Order to Show Cause to award exclusive custody of the children to Germandig, and submitted an affidavit in which she accused Shaikh of "verbal harassment" and also claimed that Shaikh had "kicked" his daughter sometime in February. *Id.* at ¶ 245. Although Germandig was present and placed under oath, Shaikh alleges she was not asked any questions about these allegations, but only questioned about her telephone account. *Id.* at ¶¶ 246-47.

Judge Einbinder allegedly granted the oral, *ex parte* request for an Order to Show Cause and, in a written order dated April 23, awarded Germandig "sole, legal and residential custody of the children," stripped Shaikh of legal and physical custody indefinitely until "further order of the

Court," and "barred [him] from returning to the residence." *Id.* at ¶ 248. The April 23 Order made

no provision for parenting time, and provided "no explanation for the decision to strip Shaikh of

custody and no plenary hearing has ever been held." *Id.* at ¶ 249. Shaikh also alleges that Judge

Einbinder did not make any explicit fact findings or conclusions of law, but rather that Judge

Einbinder stated, without any factual basis, "there is a concern that the Court that Mr. Shaikh may

try to take the children. So I do feel that it rises to the level of immediate and irreparable harm[.]"

*Id.* at ¶ 250.

On June 13, 2014, Judge Einbinder heard oral argument on the motion, but did not hold a

plenary hearing. *Id.* at ¶ 251. Shaikh alleges he appeared *pro se* at this June 13 proceeding,

"contradicted virtually all of Germandig's assertions," and denied allegations of child abuse. *Id.*

at ¶ 251. On June 13, 2014, Judge Einbinder entered an order that Germandig continue to have

"full legal and physical custody," directed that all parenting time of Shaikh with his daughter M.S.

was suspended indefinitely, and provided for two visits each week with the other two children, but

no overnights. *Id.* at ¶ 252. Judge Eindbinder also ordered Shaikh and Germandig to mediate the

issue of parenting time, and ordered a "variety of other things," including "requiring Shaikh to

attend anger management, make various financial payments and requiring him to turn over a

variety of documents including his passport." *Id.* at ¶¶ 253-54.

On August 29, 2014, Judge Einbinder ordered that all Shaikh's parenting time with his

children was suspended until further notice because Shaikh had failed to comply with her earlier

Order. *Id.* at ¶ 255. Shaikh alleges that this suspension of parenting time "appears to have been

based on unsubstantiated allegations that Shaikh was going to flee the country" and "[t]he denial

of parenting time also appears to have been intended to 'punish' Shaikh for failing to comply with

these court orders." *Id.* at ¶ 256. On December 12, 2014, Judge Einbinder denied Shaikh's

20

requests for joint legal custody, stating that Shaikh had not shown changed circumstances.  *Id.* at ¶ 260.

**B.    Additional Claims of Surender Malhan, Anthony Quinlan, and Karl Hagberg**

Surender Malhan and Anthony Quinlan's claims concerning their custody hearings were previously dismissed by the Court, with prejudice, as barred by the statute of limitations.  Unlike Graf, neither Malhan nor Quinlan have amended their allegations to include claims concerning their custody hearings that would not be barred by the statute of limitations, and the facts underlying those claims, originally set forth in this Court's prior opinion, will not be repeated here.

Both Malhan and Quinlan also asserted claims concerning (1) a gag order entered against Malhan and (2) a weapons order entered against Quinlan.  The Court previously dismissed these claims, without prejudice, based on Plaintiffs' failure to plead how any of the actions of the individual defendants, sued under a theory of *respondeat superior*, caused these plaintiffs harm. Subsequently, Plaintiffs filed the Second Amended Complaint in an attempt to cure the defects in their pleadings.

With respect to Malhan's "gag order," Plaintiffs now allege that on or about February 18, 2014, a television news reporter interviewed Malhan and two other plaintiffs in the instant suit about their experiences in family court and their complaints about constitutional deprivations.  *Id.* at ¶ 194.  On February 4, 2014, Judge Nanci Sivilli issued a "gag order" restraining Malhan from (1) discussing any issues surrounding the divorce or custody proceedings with any employee of any media (2) posting anything on the internet discussing these issues, (3) discussing any aspect of the divorce litigation with his children, and that (4) "[t]he Gag Order further restrains Malhan from discussing <u>this case</u> with one of his co-[plaintiffs], Karl Hagberg, who is an employee of Currents Magazine."  *Id.* at ¶¶ 195-97 (emphasis in original).  Malhan alleges that Judge Sivilli

21

did not hold a plenary hearing and "made no findings whatsoever specific to Malhan or his children," but rather "'found' that publicity about divorce proceedings was not in the best interests of the children." Sec. Am. Compl. ¶¶ 198-99. In addition to Malhan's challenge to the gag order in No. 14-0760, Hagberg has also challenged Malhan's gag order in No. 15-3519, alleging that "[t]he Gag Order further restrains Malhan from discussing <u>his federal case</u> with one of his co-defendants, Karl Hagberg, who is an employee of Currents Magazine" and that "[b]ecause Hagberg is an employee of currents Magazine the Gag Order prevents him from even discussing the ongoing constitutional violations with Mr. Malhan." *See* No. 15-3519 Compl. ¶¶ 81, 83 (emphasis in original); *see also id.* at ¶¶ 79-83, 253, 255. Plaintiffs allege that sometime after issuing the "gag order," Judge Sivilli recused herself, but did not vacate the order. *Id.* at ¶ 12.

With respect to Quinlan's weapons order, the Second Amended Complaint now alleges that Judge Maureen Sogliuzzo entered a custody order in December 2010, but the Second Amended Complaint continues to fail to identify (1) when the weapons order was entered and (2) which judge entered the weapons order. Quinlan's allegations, as they relate to the weapons order, are:

> Further, the Court denied and continues to deny Quinlan due process and his Second Amendment rights by ordering him not to possess any weapons. The Court issued this Order without any type of hearing on the issue or any showing that Quinlan's possession of weapons presented a danger. Thus Quinlan demands a declaratory and injunctive relief that the State and county may not deprive a person the fundamental right to keep and bear arms without showing the Order is necessary on a case by case basis, and the Order is at the very least narrowly tailored to an important state interest.

Sec. Am. Compl. ¶ 238.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss,

courts must first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010). In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Third Circuit requires a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.*; *see also Iqbal*, 556 U.S. at 678-79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). It is well established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Generally, when determining a motion under Rule 12(b)(6), the court may only consider the complaint and its attached exhibits. However, while "a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (citation omitted); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## III.     DISCUSSION

In Count I of the Second Amended Complaint, Plaintiffs seek a declaration that Defendant Judges have deprived Plaintiffs of their fundamental rights to care, custody, and control of their minor children without due process, specifically, without affording them adequate notice, "discovery and courtroom procedures," the right to counsel, the right to cross examine accusers, and the right to present evidence in one's defense, and by employing the "preponderance of the evidence" standard (or no standard at all). Plaintiffs also request injunctive relief.

In Count II of the Second Amended Complaint, Plaintiffs seek a declaration that the use of the "Best Interests" and "preponderance of the evidence" standards as a basis for suspending or terminating parental rights and other fundamental rights is unconstitutional. Plaintiffs also request injunctive relief.

In Count III of the Second Amended Complaint, Plaintiffs seek a declaration that Defendant Judges violated the equal protection clause of the 14th Amendment by (1) requiring the State to show "extraordinary circumstances" when terminating the parental rights of a parent, but utilizing a lower standard (or no standard) when denying the custody rights of one parent in favor of another parent, and (2) by providing indigent parents who are accused by the State of abuse or neglect in a proceeding to terminate parental rights with a constitutional right to counsel, but not

Appellants' Appendix page   A67

providing the same right to indigent parents in the context of divorce proceedings or other inter-parent disputes that may result in a loss of custody. Plaintiffs also request injunctive relief.

Finally, in Count IV of the Second Amended Complaint, Plaintiffs requests a declaration that their fundamental rights, including their First and Second Amendment rights, may not be taken away without due process merely because they are in a family court, and the court believes it is acting in the best interests of children.

### A. Defendant Judges are Not the Appropriate Parties to Defend the Constitutionality of the Laws at Issue in these Matters.

Plaintiffs' claims, brought under Section 1983 and the Declaratory Judgment Act, seek declaratory and injunctive relief against Defendant Judges. While the Supreme Court held in *Pulliam v. Allen*, 466 U.S. 522, 540-42 (1984) that judicial immunity is not a bar to claims for injunctive or declaratory relief under Section 1983, Congress amended Section 1983 in 1996, as part of the Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, 110 Stat. 3847 (1996), to provide that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." *See Chadwick v. Court of Common Pleas*, 244 F. Appx. 451, 455 (3d Cir. 2007). Thus, Section 1983 now provides, in relevant part:

> Every person who, under color of any statute . . . of any State, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in . . . [a] suit in equity . . . *except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable*.

(Emphasis added). As the Third Circuit has explained, this amendment of Section 1983 "does not expressly authorize suits for declaratory relief against judges. Instead, it implicitly recognizes that declaratory relief is available in some circumstances, and then limits the availability of injunctive

relief to circumstances in which declaratory relief is unavailable or inadequate." *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 197-98 (3d Cir. 2000); *see also Azubuko v. Royal*, 443 F.3d 302, 304 (3d Cir. 2006).

Since Plaintiffs do not allege that any of the Defendant Judges violated a declaratory decree, whether Plaintiffs can seek injunctive relief turns on whether declaratory relief is available in this matter. As discussed in more detail below, with respect to Plaintiffs' claims concerning their custody hearings, declaratory relief is unavailable to Plaintiffs in this court and, therefore, Plaintiffs may only seek injunctive relief under Section 1983.

As the Third Circuit has recognized, the "seminal case on the subject" of "[d]etermining whether . . . declaratory relief is available" against judges named as defendants in a Section 1983 action is *In re Justices of The Supreme Court of Puerto Rico*, 695 F.2d 17 (1st Cir. 1982). *Reynolds*, 201 F.3d at 198. In *In re Justices*, the Justices of the Puerto Rico Supreme Court were named as defendants in a lawsuit challenging the constitutionality of a statute requiring members of the bar to support the bar association through dues payments. In dismissing the case against the Justices, the First Circuit held that a party who challenges a statute on constitutional grounds does not have legal interests adverse to judges who merely adjudicate claims under that statute; the theory underlying that obvious tenet is that judges in such a position "sit as arbiters without a personal or institutional stake on either side of the constitutional controversy." 695 F.2d at 21. The First Circuit further reasoned that because judges typically have no role in a statute's enactment, they have no personal stake in the outcome of the constitutional challenge. *Id.*

26

As the Third Circuit has explained, the relevant inquiry to determine whether judicial defendants are the proper defendants[6] for declaratory relief under Section 1983 turns on whether the "judge acted as an adjudicator rather than an enforcer or administrator of a statute."  *Reynolds*, 201 F.3d at 199.  Here, Plaintiffs seek a declaration that the "best interests" standard applied by the Defendant Judges is an unconstitutional basis on which to deprive Plaintiffs of equal parenting time.  Importantly, the "best interests of the child" standard is codified in a legislative enactment. *See Gubernat v. Deremer*, 140 N.J. 120, 139 (1995); *see also* N.J.S.A. 9:2-3, 9:2-4(c), 9:2-4a. Thus, the actions of the Defendant Judges in applying this standard to the Plaintiffs' custody disputes is in the nature of an adjudicative function.

Similarly, the fact that several of the "laws" concerning adequate notice, the right to counsel, and the right to a plenary hearing are not embodied in legislative enactments, but rather in court rules promulgated by the New Jersey Supreme Court and in binding judicial decisions from appellate courts interpreting the relevant constitutional provisions,[7] does not vest these Defendant trial court judges with any adversarial interest in defending the constitutionality of these rules of law.  *See R.W.T. v. Dalton*, 712 F.2d 1225, 1233 (8th Cir.) ("Although the plaintiffs here characterize their attack as one upon the court's 'practice' rather than upon the constitutionality of the Missouri statutes or Supreme Court Rules, this distinction makes no difference to our analysis."), *cert. denied*, 464 U.S. 1009 (1983).  The court rules and judicial interpretations at issue in these matters were not promulgated, or authored, by the Defendant Judges.  *Cf. Supreme Court*

---

[6] The Third Circuit, and other Courts of Appeal, have opted not to rest their decisions on the basis of Article III standing, but have couched their analysis in terms of whether judges are "proper defendants" when they act as neutral arbiters.  *See Reynolds*, 201 F.3d at 198-99 (citing cases).

[7] *See Parham v. Johnson*, 126 F.3d 454, 456 (3d Cir. 1997); N.J. Ct. R. 5:8-6; *Faucett v. Vasquez*, 411 N.J. Super. 108, 127-28 (App. Div. 2009), *certif. denied*, 203 N.J. 435 (2010); *Hand v. Hand*, 391 N.J. Super. 102, 105 (App. Div. 2007).

27

*of Virginia v. Consumers Union of Am., Inc.*, 446 U.S. 719 (1980) (permitting suit against judges to enjoin them from enforcing bar membership requirement the judges themselves promulgated in the form of court rules, which made their involvement in the litigation more direct and which gave them an institutional stake in the litigation's outcome). Therefore, the trial judges who did not promulgate these court rules or hand down these controlling precedents, but who merely adhere to and apply these legal authorities in the matters before them, function as adjudicators.

Moreover, this Court shares in the comity concerns, identified by the First Circuit, necessarily implicated in requiring judges, named as defendants, to assume the roles of "advocates or partisans" in federal court to defend the state laws and rules they are charged to neutrally apply:

> To require the Justices unnecessarily to assume the role of advocates or partisans on these issues would tend to undermine their role as judges. To encourage or even force them to participate as defendants in a federal suit attacking Commonwealth laws would be to require them to abandon their neutrality and defend as constitutional the very laws that the plaintiffs insist are unconstitutional -- laws as to which their judicial responsibilities place them in a neutral posture. Indeed, a public perception of partiality might well remain even were the Justices to take no active part in the litigation. The result risks harm to the court's stance of institutional neutrality -- a harm that appeal would come too late to repair.

*In re Justices*, 695 F.2d at 25.

In short, Defendant Judges are not the proper defendants for Plaintiffs' request for declaratory relief, since they have no adversarial interest in defending the constitutionality of the laws they are charged with neutrally applying, and may continue to apply should they retain jurisdiction, in the custody hearings. The Defendant Judges acted as neutral arbiters[8] in the custody

---

[8] To the extent that Plaintiffs might take issue with the nomenclature used – neutral arbiter – because Plaintiffs may, in some instances, believe that one or more of the Defendant Judges harbored a bias against any of the Plaintiffs, the reference to "neutral arbiters" here simply describes the function of a judge who acts in an adjudicative role, rather than as an advocate or partisan with identifiable adversarial interests in the litigation before him or her.

proceedings, not as "enforcers" or "administrators" of a statute or court rule – which they themselves did not promulgate.

Since declaratory relief from Defendant Judges is not available to Plaintiffs, and they do not claim a declaratory decree was violated, Plaintiff's may seek injunctive relief under Section 1983.    However, Plaintiffs' claims for injunctive relief must fail because Plaintiffs cannot demonstrate that they have no adequate remedy at law.  *See N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984) ("A party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law.") (citing *Hillsborough v. Cromwell*, 326 U.S. 620, 622 (1946)).  To the extent Plaintiffs perceive that they were aggrieved by the underlying custody decisions by the Defendant Judges, each Plaintiff had an available avenue of relief:  to file an appeal with the Appellate Division of the Superior Court of New Jersey (and beyond).  *Johnson v. N.J.*, 869 F. Supp. 289, 294 (D.N.J. 1994) (citing *Pulliam*, 466 U.S. at 541-42).

And that, of course, is the crux of this matter, at least insofar as it concerns the custody orders at issue here.  The Court's decision today is not intended to downplay or denigrate the important rights that Plaintiffs allege have been violated – Plaintiffs merely have chosen the incorrect method for vindicating those rights.  When a litigant believes that a judge, acting as a neutral arbiter, violates the litigant's constitutional rights or does not correctly apply the law, that litigant's method of recourse is clear:  he or she should appeal the adverse decision, not collaterally attack it by way of an action against the trial judge under Section 1983.  State courts are as competent as federal courts to address claims arising under the federal constitution. *See Rizzo v. Goode*, 423 U.S. 362, 380 (1976).  As the Eighth Circuit has explained:

> Federal courts (except for the Supreme Court) are not superior to state courts, or higher in any theoretical order of precedence.  Federal law is supreme and, if valid,

> supersedes state law no matter what court declares it. Federal law declared by a state court, for example, is supreme over state law declared by a federal court. It is not the forum that counts, but the law-making authority. Making state judges defendants in a federal court unnecessarily undermines this cornerstone of our federal system.

*Dalton*, 712 F.2d at 1233 (internal quotation marks and citation omitted).

Indeed, although "custody orders are always subject to change" in New Jersey, *Kiernan v. Kiernan*, 355 N.J. Super. 89, 93 (App. Div. 2002), they are deemed final for purposes of appeal. N.J. Ct. Rules 2:2-3; 5:8-6. Thus, since Plaintiffs could have, and may in the future, appeal to the state appellate courts, the New Jersey Supreme Court, and even the Supreme Court of the United States, any custody order they believe is entered in violation of their rights, whatever they imagine those rights are or should be, they have not shown that they have no adequate remedy at all, and their request for injunctive relief against Defendant Judges must be dismissed.

### B.    Malhan's Gag Order & Quinlan's Weapons Order

The same analysis set forth above holds true for Malhan's claims regarding Judge Sivilli's gag order and Quinlan's claim regarding the weapons order entered by an unidentified judge.[9] These orders were entered by judges presiding over Plaintiffs' custody matters in an adjudicative capacity and, therefore, they are not proper defendants for Plaintiffs' claims seeking declaratory relief. Nor can Plaintiffs' claims for injunctive relief succeed, since Plaintiffs could have appealed these orders either by seeking interlocutory review or filing notices of appeal when the orders became final.[10]

---

[9] The Court notes that, no matter which judge entered the weapons order, the analysis would not change and, therefore, permitting Plaintiff Quinlan an opportunity to amend his complaint is not necessary because it would be futile. *See Shane v. Fauver*, 213 F.3d 113, 115-16 (3d Cir. 2000).

[10] The Court notes that, although Malhan has been denied interlocutory review of his gag order, his appeal rights have not been entirely extinguished.

Appellants' Appendix page   A73

These orders were not entered in matters where the Defendant Judges were empowered by statute to exercise administrative, executive, or legislative functions. *Cf. Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) (holding that Chief Justice was a proper defendant in a Section 1983 claim challenging the constitutionality of a vexatious litigation statute because of his role as chair of the Judicial Council of California, which maintained and disseminated the list of vexatious litigants); *Georgevich v. Strauss*, 772 F.2d 1078 (3d Cir. 1985) (en banc) (holding that class of prisoners properly sued defendant judges who administered the parole power), *cert. denied*, 475 U.S. 1028 (1986). Where a judge issues an order in a matter she presides over as a neutral arbiter, her drafting of that order is not a "legislative" function, and her ability to "enforce" that order does not transform the judge into an executive officer or a party with an adverse interest to the litigant to which the order applies. *See Nollet v. Justices of the Trial Court*, 83 F. Supp. 2d 204, 211 (D. Mass.) (holding that judges who "fashion[] the conditions of both temporary and permanent restraining orders . . . are not acting in either an enforcement, administrative, or legislative capacity when they consider the merits of" the petition for the restraining order), *aff'd*, 248 F.3d 1127 (1st Cir. 2000). As the First Circuit succinctly explained by way of analogy in *In re Justices*: "In short, § 1983 does not provide relief against judges acting purely in their adjudicative capacity, any more than say, a typical state's libel law imposes liability on a postal carrier telephone company for simply conveying a libelous message." 695 F.2d at 22.

In opposition to the motions to dismiss, Plaintiffs cite to of *Nichols v. Sivilli*, No. 14-3821, 2014 U.S. Dist. LEXIS 175391 (D.N.J. Dec. 19, 2014), in which another district court in New Jersey considered a challenge – to the same gag order at issue in this matter – by a news reporter who wished to interview Malhan. However, Plaintiffs' reliance on this unpublished decision is

misplaced.[11]  The court in *Nichols* distinguished *In re Justices*, arguably out of context,[12] to determine that Article III standing existed between the plaintiff – who was not a party to the custody matter in which the gag order was issued – and Judge Sivilli because she had drafted the gag order herself and was empowered to enforce it.  *Id.* at *7-9.  However, the court in *Nichols* did not reach the issue of whether declaratory or injunctive relief was appropriate against Judge Sivilli.  Instead, the court dismissed the claim for injunctive relief against Judge Sivilli without prejudice because the plaintiff "ha[d] not alleged in the [Second Amended Complaint] that declaratory relief is unavailable or inadequate."  *Id.* at *17.

Unlike the third-party reporter in Nichols, Malhan and Quinlan were parties to the litigation in which the gag and weapons orders were entered against them, respectively.  Plaintiffs' interpretation of Section 1983 – that any litigant aggrieved by any order of a trial court may file a complaint against the judge who issued it, merely because the judge could "enforce" his or her own order – would turn our court system completely on its head.  Indeed, if that were the rule, it is likely that federal district courts would be inundated with Section 1983 suits collaterally attacking judges' orders so as to avoid the more deferential review those orders might receive in appellate courts.  Instead, when a judge presiding over a case – and acting in an adjudicative capacity – has entered an order which a litigant believes violates his or her constitutional rights, or

---

[11] Moreover, the Court notes that it is not bound by the decisions of other district courts. *See Altana Pharma AG v. Teva Pharms. USA, Inc.*, No. 04-2355, 2013 U.S. Dist. LEXIS 74210, *19-20 (D.N.J. May 14, 2013); *Columbia Casualty Co. v. Statewide Hi-Way Safety, Inc.*, 94 F.R.D. 182, 184 (D.N.J. 1982).

[12] *See Reynolds*, 201 F.3d at 199 n.3 (noting that the First Circuit and "[t]he other courts of appeals addressing the issue have . . . opted not to rest their decisions on the basis of Article III") (citing *Grant v. Johnson*, 15 F.3d 146, 148 (1994); *Dalton*, 712 F.2d at 1232-33; *Mendez v. Heller*, 380 F. Supp. 985, 990 (E.D.N.Y. 1974), *aff'd*, 530 F.2d 457 (2d. Cir. 1976)).

is otherwise incorrect or unjust, that litigant should either seek interlocutory review of the order or appeal the order when it becomes final.

Accordingly, Malhan's claim concerning his gag order and Quinlan's claim concerning his weapons order are dismissed with prejudice.

### C.    Hagberg's Challenge to the Malhan's Gag Order

 The only claim that remains is Hagberg's challenge to Malhan's gag order, asserted in No. 15-3519 (to which Malhan is not a party).[13]  *See* No. 15-3519 Compl. ¶¶ 79-83, 253, 255.   Hagberg alleges that "[t]he Gag Order further restrains Malhan from discussing <u>his federal case</u> with one of his co-[plaintiffs], Karl Hagberg, who is an employee of Currents Magazine" and that "[b]ecause Hagberg is an employee of currents Magazine the Gag Order prevents him from even discussing the ongoing constitutional violations with Mr. Malhan."  *See* No. 15-3519 Compl. ¶¶ 81, 83 (emphasis in original); *see also id.* at ¶¶ 79-83, 253, 255.

However, the gag order does not specifically restrain Malhan from discussing "his federal case" or the "ongoing constitutional violations" with Hagberg insofar as Hagberg is a co-plaintiff in No. 14-0760.  Instead, the gag order enjoins Malhan from "speaking with, appearing for an interview, or otherwise discussing any of the parties, the parties' marriage, their pending divorce, the within litigation, or the parties' children with *any reporters, journalists, newscasters, or other agents/employees of newspapers or other media outlets on the grounds*."  Certification of Surender

---

[13] The Court notes that while the Second Amended Complaint in No. 14-0760 makes an oblique reference to the gag order restraining Hagberg's ability to speak to Malhan, *see* Second Amended Complaint ¶ 196, it only does so in a section entitled "Facts Relevant to Malhan," Indeed, on May 8, 2014, the Court abstained from addressing the gag order in No. 14-0760, despite noting that it raised "serious constitutional concerns," based on the *Rooker-Feldman* doctrine, and thus I will not address the gag order in the context of No. 14-0760.  *See* No. 14-0760, Dkt. No 8.

Malhan [hereinafter "Malhan Cert."] ¶ 3, Ex. A at ¶¶ 5-6 (emphasis added).[14] Thus, to the extent that Hagberg challenges the gag order on the grounds that it enjoins Malhan from discussing the these matters with Hagberg as a co-plaintiff in No. 14-0760, that claim must fail because the gag order does not so provide.

The gag order does, however, appear to enjoin Malhan from discussing these matters with Hagberg in his capacity as an employee of *Currents* magazine. "[T]hird parties have standing to challenge protective orders and confidentiality orders in an effort to obtain access to information or judicial proceedings." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996) (quoting *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 777 (3d Cir. 1994)). Third-parties seeking to challenge such orders do not lack standing merely because they assert rights that may belong to a broad portion of the public at large, so long as the "injury in fact" alleged by each third-party is "a distinct and palpable injury to himself," standing should not be denied "even if it is an injury shared by a large class of other possible litigants." *United States v. Cianfrani*, 573 F.2d 835, 845-46 (3d Cir. 1978) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). However, they must still show the "gag orders have caused them injury in fact and that their injury is likely to be redressed by a favorable decision," which includes a showing that "there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so." *FOCUS*, 75 F.3d at 838-39.

The parties have not addressed whether, despite having Article III standing to challenge the gag order, it is appropriate for Hagberg to bring a separate proceeding under Section 1983

---

[14] While generally a court may not consider matters outside the pleadings when ruling on a motion to dismiss, documents that are "integral to or explicitly relied upon in the complaint" may indeed be considered without converting a motion to dismiss into a motion for summary judgment. *Angstadt*, 377 F.3d at 342 (citation omitted).

against Judge Sivilli to challenge the gag order, rather than merely intervening in Malhan's custody proceeding.    Nor have the parties adequately addressed whether Judge Sivilli remains an appropriate defendant in this action, since she has recused herself from Malhan's custody case.[15] *See* No. 15-3519 Compl. ¶ 12.   Accordingly, this Court will not address these issues at this time and this remains the only active claim in No. 15-3519.

### D.    Hagberg and Shaikh's Motion for a Preliminary Injunction.

Since the Court grants Defendant Judges' cross-motion to dismiss in No. 14-0760, Plaintiffs Hagber and Shaikh's motion for a preliminary injunction in No. 14-0760 is denied as moot.  *See Camden Cnty. Recovery Coalition v. Camden City Bd. of Ed.*, 262 F. Supp. 2d 446, 448 (D.N.J. 2003).

## IV.    CONCLUSION

For the foregoing reasons, Defendant Judges' motion to dismiss in No. 14-0760 is granted and all of the claims asserted in that matter are dismissed with prejudice.   Defendant Judges' motion to dismiss in No. 15-3519 is granted in part and denied in part.   Specifically, all claims in No. 15-3519 are dismissed with prejudice except for Plaintiff Hagberg's challenge, as an employee of a media outlet, to the gag order entered by Judge Sivilli against Plaintiff Malhan, which remains the only active claim in this litigation.   Finally, Plaintiffs' motion for a preliminary injunction in No. 14-0760 is denied as moot.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

---

[15] Plaintiff Hagberg is directed to inform this Court within 10 days as to whether the gag order remains in effect, or has modified or vacated.